**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ricardo A. BRAVO, Defendant–
Appellant.**

**No. 01–50159.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 2001.

Submission Withdrawn Nov. 21, 2001.

Re-submitted May 13, 2002.

Filed July 8, 2002.

1004

Benjamin L. Coleman, Federal Defenders of San Diego, Inc., San Diego, California, argued the cause for the defendant–appellant; Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, California, was on the briefs.

Patrick K. O'Toole, United States Attorney, San Diego, California, argued the cause for the plaintiff-appellee; Bruce R. Castetter, Assistant United States Attorney, and Renee M. Bunker, Assistant United States Attorney, San Diego, California, were on the brief.

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

Before: O'SCANNLAIN, PAEZ, Circuit Judges, and KING,* District Judge.

O'SCANNLAIN, Circuit Judge.

We must decide whether, under the Fourth Amendment, a border search of a toolbox in the bed of a truck was routine and whether a detention became an arrest when a customs inspector briefly handcuffed the truck's driver.

I

On September 23, 2000, Ricardo A. Bravo entered the United States from Mexico at the Calexico, California, West Port of Entry as the sole occupant of a 1981 Chevrolet Silverado. In response to routine questions from Customs Inspector Albert Tijerina during a primary inspection, Bravo stated that he was an American citizen traveling to the market and post office, that he had nothing to declare, and that he had borrowed the truck from a friend, which explained why he was not its registered owner. Inspector Tijerina thought Bravo was being "overly-friendly" in answering his questions. He asked an Immigration Service Canine Enforcement Officer, who was conducting a pre-primary roving operation, to "run" his detector dog around the truck. The dog "alerted" to the toolbox in the bed of the truck.

Senior Inspector Carlos Flores, present during the dog's alert, inspected the toolbox by banging its side and underside with his hands. He heard a solid sound, which suggested that there was more than just loose tools stored inside. He opened the toolbox by undoing a latch on the lid and felt the toolbox's inner floor and walls with his hands. In so doing, he noticed a depth discrepancy between what should have been the floor of the box and the actual

bottom of the box. He notified Inspector Tijerina of the space discrepancy.

Inspector Tijerina had Bravo exit the vehicle and conducted a brief "frisk" of his waist area before handcuffing him. Once handcuffed, Inspector Tijerina escorted Bravo to a security office to await the search of his truck. Inspector Tijerina told Bravo that he would remove the handcuffs when they reached the security office, which was about 30–40 yards away, and that the handcuffs were for both his own safety and Bravo's. He also informed Bravo that he would be free to go if nothing was found in his truck and that these were all routine measures.

Inspector Tijerina testified that he does not handcuff everyone whose vehicle is referred to secondary inspection, but here he exercised his discretion to handcuff Bravo for the following reasons: Bravo was only 20 yards away from the border, which made this a potential flight risk situation; two other border inspectors had been shot under similar circumstances; a detector dog had "alerted" to Bravo's vehicle; Bravo had been "overly friendly"; and, finally, Inspector Flores had noticed a space discrepancy in the toolbox. Once in the security office, Inspector Tijerina removed the handcuffs as promised, patted-down Bravo's outer clothing for weapons and contraband, and had Bravo empty his pockets. Bravo had been handcuffed for a total of one to two minutes, and he was then left to wait, unhandcuffed, in the security office.

Inspector Tijerina inspected the truck in the "take down area." He opened the toolbox by releasing a latch on the lid and tapped on the bottom, which gave a solid sound as if something was inside. He also observed the space discrepancy that Inspector Flores had noted before. After removing the tools and sliding the toolbox down the bed of the truck and away from the truck's cabin, Inspector Tijerina saw an access plate to a compartment at the base of the box. He hammered at some adhesive that held the plate in place; this action released the access plate but caused damage to the toolbox. Inside the secret compartment, Inspector Tijerina found over 50 kilograms of marijuana.

Subsequently, Inspector Tijerina told Bravo that he was under arrest for smuggling drugs and moved him to a holding cell. When Customs Special Agent Juan Jacobo arrived, he advised Bravo of his *Miranda* rights, which Bravo waived. Bravo then admitted that he agreed to transport drugs across the border for $600.

A federal grand jury indicted Bravo for importing marijuana and possessing marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 952, and 960. The district court denied Bravo's motion to suppress the evidence found in his vehicle because the search of the truck's toolbox was routine and did not require an elevated level of suspicion. Even if the search had been non-routine, the district court found that it was supported by reasonable suspicion. It also denied Bravo's motion to suppress his confession because, when Inspector Tijerina escorted Bravo to the security office in handcuffs, he had merely been detained and was not under arrest. After the district court's decision, Bravo pled guilty to one count of the indictment pursuant to a conditional plea agreement that allowed him to appeal. The district court sentenced Bravo to twelve months and one day in custody and three years of supervised release. This timely appeal followed.

II

The task of guarding our country's borders is one laden with immense responsi-

bility. We recognize that "[c]areful review of transit through our international borders is essential to national security, health, and public welfare." *United States v. Okafor,* 285 F.3d 842, 845 (9th Cir.2002); *see also United States v. Montoya de Hernandez,* 473 U.S. 531, 544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("At the border, customs officials have more than merely an investigative law enforcement role. They are also charged, along with immigration officials, with protecting this Nation from entrants who may bring anything harmful into this country."). Searches of individuals seeking entrance into our country "may interdict those who would further crime, introduce matter harmful to the United States, or even threaten the security of its citizens." *Okafor,* 285 F.3d at 845.

 Thus, it has long been established that routine searches at our international borders do not require objective justification, probable cause, or a warrant. *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304 ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant."). Of course, the search must be "routine" to fall under this broad category of permissible suspicionless searches. We have determined that searches involving extended detention or an intrusive search of a person's body are not routine. *See, e.g., United States v. Ramos–Saenz,* 36 F.3d 59, 61 (9th Cir.1994); *see also Montoya de Hernandez,* 473 U.S. at 541 n. 4, 105 S.Ct. 3304 (listing strip, body cavity, or involuntary x-ray searches as non-routine border searches). In those circumstances, customs officials are required to have "reasonable suspicion" to support the search. *See United States v. Gonzalez–Rincon,* 36 F.3d 859, 864 (9th Cir.1994) (reasonable suspi-

cion required for continued detention and x-ray examination of suspected alimentary canal drug smuggler at border); *Ramos–Saenz,* 36 F.3d at 61.

Bravo argues that the search of the toolbox on his truck was a non-routine border search because it involved force and caused damage. If the search was non-routine, it must have been supported by a reasonable suspicion of illegal activity. We recently extended the non-routine border search doctrine to vehicles and other objects—not just bodies. *United States v. Molina–Tarazon,* 279 F.3d 709 (9th Cir. 2002), established a non-exhaustive list of factors to determine when a search morphs from routine to non-routine: use of force, danger to the person whose possession is being searched, and the psychological intrusiveness of the search.

In *Molina–Tarazon,* customs agents removed and dismantled the fuel tank of Molina–Tarazon's truck looking for contraband. A mechanic hoisted the truck onto a lift and removed several bolts and straps that connected the tank to the truck, which also disengaged electrical connections and hoses. *Id.* at 712. After removing the sensing unit, the mechanic discovered 31 packages of marijuana inside the fuel tank. *Id.* Using the three factors listed above, we held that this was a non-routine search, but the customs agents had reasonable suspicion to support it. *Id.* at 717–18. We now apply *Molina–Tarazon*'s factors to the case before us.

First, *Molina–Tarazon* noted that "while force is a factor in assessing a search's intrusiveness, it is not dispositive. For example, if the lock is jammed on a suitcase . . . , agents have to employ some degree of force to gain access to its interior. But this fact alone does not render a search overly intrusive." *Id.* at 714.[1] The

---

1. *Okafor* does not change our analysis of the

weight *Molina–Tarazon* gave to the use of

use of tools, breaking, drilling, or permanently altering a portion of the item being searched constitutes the use of force. *Id.* Here, Inspector Tijerina used tools to hammer loose an access plate to a compartment of Bravo's toolbox. This damaged the toolbox, or, as Inspector Tijerina's testified at the evidentiary hearing:

> Q: If you wanted to put [the toolbox] back together again, would you have been able to simply reapply some [adhesive] and would that have put it in a position where you could have slid it back?
>
> A: No, sir.

The force used to open Bravo's toolbox suggests that this was a non-routine search; however, we look at the applicability of the remaining *Molina–Tarazon* factors.

*Molina–Tarazon* held that the risk of danger a search poses to a person bears on its reasonableness under the Fourth Amendment. *Id.* at 714–15; *see also Winston v. Lee,* 470 U.S. 753, 761, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) ("[T]he extent to which the procedure may threaten the safety or health of the individual" is an important factor in measuring the degree of a search's intrusiveness.). While in *Molina–Tarazon,* the defendant would have been in great danger had the fuel tank and truck been improperly reassembled, 279 F.3d at 715 ("An error in removing, disassembling and then reassembling the portion of a motor vehicle that contains a highly flammable and potentially explosive substance like gasoline might well result in disastrous consequences for the vehicle's owner."), here, the removal and reattach-ment of the toolbox, even if done incorrectly, would not have posed a grave risk to Bravo.

Third, *Molina–Tarazon* considered whether the search was psychologically intrusive, specifically if it would "cause fear or apprehension in a reasonable person." *Id.* at 716. In *Molina–Tarazon,* we held that a person would be understandably reluctant to drive his truck after it had been taken apart and reassembled by a "government contractor whose qualifications, reputation and expertise are unknown to the vehicle's owner, rather than by a mechanic the owner knows and trusts." *Id.* Here, however, the faulty reassembly of Bravo's toolbox would not pose the same risk, and, unlike *Molina–Tarazon* where the search necessitated the dismantling and reassembly of components critical to the truck's functioning and safe operation, Bravo could confirm for himself, as a layperson, that the toolbox was secured and re-bolted to the bed of his truck. *See id.* at 717. Therefore, we cannot say that the search of Bravo's toolbox constituted a psychological intrusion that would cause him fear or apprehension.

Finally, we also note that the search did not involve undue or excessive delay. It appears to have taken only minutes. *See id.* at 713 n. 5; *Okafor,* 285 F.3d at 846. Thus, while Inspector Tijerina used force to open the toolbox, which caused damage, the remaining factors suggest that the search was not non-routine.

 In any case, we need not decide this question because even if the unbolting

---

force in determining whether a border search was non-routine. *Okafor,* in dictum and citing *Molina–Tarazon,* speculated that if the defendant's "bag ha[d] been significantly damaged, and perhaps even absent damage if it ha[d] been significantly altered or otherwise tampered with, that would *tend* to make the search non-routine." *Okafor,* 285 F.3d at 846 n. 1 (emphasis added). We do not believe that this dictum was meant to override *Molina–Tarazon 's* clear teaching that force alone is not dispositive of a search's routineness per se.

and hammering open of Bravo's toolbox constituted a non-routine search, it would be permissible so long as the officers had a reasonable suspicion of illegal activity. To make this determination, we "must look at the totality of the circumstances of [the] case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quotation marks omitted). While an officer's experience is relevant to our inquiry, *id.* at 750–51, 122 S.Ct. 744 (stating that officers may draw upon their experience to make inferences about the circumstances),[2] he may not base reasonable suspicion on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (quotation marks omitted).

■ Here, Bravo's "overly-friendly" demeanor first raised Inspector Tijerina's suspicions. More importantly, Inspector Flores tapped the toolbox, which made a solid sound, suggesting that there was more in the toolbox than just loose tools. Finally, Inspector Flores noted a space discrepancy in the base of the toolbox, which indicated a hidden compartment. Taken together, these three factors supplied Inspector Tijerina with ample individualized suspicion to engage in a non-routine search of the toolbox.[3] *See, e.g., Molina–Tarazon*, 279 F.3d at 717–18 (finding reasonable suspicion based on unusual distribution of mud on truck's undercarriage and gas tank); *United States v. Most*, 789 F.2d 1411, 1416 (9th Cir.1986) (finding reasonable suspicion based on the package originating in a source country for drugs, a label describing a cheap article, and the package weighing more than expected for the label's description).

We are satisfied that the district court did not err in denying Bravo's motion to suppress the evidence found in his truck.

### III

We next examine whether the detention constituted an arrest.

■ Detention and questioning during routine searches at the border are considered reasonable within the meaning of the Fourth Amendment. *United States v. Espericueta–Reyes*, 631 F.2d 616, 622 (9th Cir.1980) ("During such a search, some period of detention for these persons is inevitable. Nevertheless, so long as the searches are conducted with reasonable dispatch and the detention involved is reasonably related in duration to the search, the detention is permissible under the Fourth Amendment."); *see also Montoya de Hernandez*, 473 U.S. at 539–40, 105 S.Ct. 3304 ("[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is

---

2. Inspector Tijerina had worked at the border for four years.

3. Bravo spends a considerable portion of his brief arguing that the government cannot rely on a drug-sniffing dog's "alert" unless it first establishes the dog's reliability. While demonstrating a dog's reliability has heretofore only been required to establish *probable cause, see United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir.1993), Bravo argues that to rely on a dog's "alert" for *reasonable suspicion* the dog must be also reliable. Here, the government did not provide evidence of the dog's reliability. Because we do not rely on the dog's "alert" to establish that customs agents had a reasonable suspicion of Bravo's illegal activity, we do not decide whether the government must prove a dog reliable before it uses its alert to establish reasonable suspicion.

also struck much more favorably to the Government at the border.") (citations omitted). At issue here is whether a "detention," which does *not* require probable cause, evolved into an "arrest," which *must* be supported by probable cause.

■ The standard for determining whether a person is under arrest is not simply whether a person believes that he is free to leave, *see United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), but rather whether a reasonable person would believe that he is being subjected to more than the "temporary detention occasioned by border crossing formalities." *United States v. Butler,* 249 F.3d 1094, 1100 (9th Cir.2001). Thus, whether an individual is in custody depends upon the objective circumstances of the situation,[4] or whether " 'a reasonable innocent person in such circumstances would conclude that *after brief questioning he or she would not be free to leave.'* " *United States v. Montero–Camargo,* 177 F.3d 1113, 1121 (9th Cir.1999) (quoting *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir.1981)) (emphasis added), *aff'd,* 208 F.3d 1122 (9th Cir.2000) (en banc) (affirming panel's decision on narrower grounds, but not disturbing panel's standard or decision on whether defendant was in custody).[5] The Supreme Court has similarly held that the "reasonable person" test presupposes an innocent person. *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

The government argues that the circumstances under which "reasonable innocent persons" would believe they are in custody are different at the border. Because of the special concerns surrounding border crossings, people expect greater intrusions into their privacy. *See Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304 ("[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than at the interior."); *United States v. Moya,* 74 F.3d 1117, 1120 (11th Cir.1996) ("We stress that events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country."). Indeed, "[i]t is well recognized that special rules apply at the border." *Butler,* 249 F.3d at 1098. Therefore, the fact that these events occurred at the border influences our inquiry into whether a reasonable innocent person would have believed that he was under arrest.

■ Bravo contends that the combination of the handcuffing, frisk, pat-down, and shoe search[6] transformed his border

---

4. The surrounding circumstances we consider include "the extent to which liberty of movement is curtailed and the type of force or authority employed." *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir.1987).

5. *Montero–Camargo* held that the defendant was not in custody for Fifth Amendment purposes, but its test is relevant to our Fourth Amendment determination because the standards for custody are similar, if not identical. *Compare Stansbury v. Cal.,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), *and United States v. Beraun–Panez,* 812 F.2d 578, 580 (9th Cir.), *modified,* 830 F.2d 127 (9th Cir.1987) (stating that an individual is in custody for *Miranda* purposes when a reasonable person would believe that he was not free to leave), *with Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (stating that an individual is under arrest for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave").

6. Bravo testified that Inspector Tijerina asked him to remove his shoes; however, Inspector Tijerina did not mention this fact in his testimony. The district court found that Bravo's testimony was not credible, but even assuming Inspector Tijerina did remove and search Bravo's shoes, the addition of that fact does not tip our totality of the circumstances analysis toward arrest. *See infra.*

detention into an arrest because a reasonable innocent person would not have felt free to leave even after his vehicle was searched. Certainly handcuffing is a substantial factor in determining whether an individual has been arrested, *see United States v. Juvenile (RRA–A )*, 229 F.3d 737, 743 (9th Cir.2000) ("Given the totality of the circumstances ... we conclude that RRA–A's handcuffing was the clearest indication that she was no longer free to leave and therefore find it to be the point of arrest."); however, handcuffing alone is not determinative. *See Booth,* 669 F.2d at 1236 ("Handcuffing a suspect does not necessarily dictate a finding of custody. Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody.") (citations omitted); *cf. United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983) ("[T]he use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, does not necessarily convert a *Terry* stop into an arrest necessitating probable cause."). We must consider the "totality of the circumstances"—not just the handcuffing—to decide whether Bravo was arrested or merely detained. *See RRA–A,* 229 F.3d at 743; *Montero–Camargo,* 208 F.3d at 1129.

The case most on point, *RRA–A,* has similar, but distinguishable facts. In *RRA–A,* when customs agents moved the car in which the defendant was a passenger to secondary inspection for a more extensive search, the defendant was taken to an office and frisked. 229 F.3d at 741. During the secondary inspection, officers found 80 pounds of marijuana in the vehicle. *Id.* RRA–A was subsequently handcuffed to a bench in a locked security office for the next four hours until an agent informed her that she was under arrest and advised her of her *Miranda* rights. *Id.* This court, analyzing the totality of the

circumstances, found that the arrest began when RRA–A was handcuffed to the bench in the locked security office, not when she was initially frisked and detained, as she contended, but also not when she was actually told that she was under arrest, as the government argued. *Id.* at 743.

Quite unlike the circumstances here, in *RRA–A,* the juvenile defendant was *handcuffed to a bench* in a *locked security office* after the officers found drugs in the vehicle in which she had been riding; at that point, we determined that she had been arrested. "A reasonable person handcuffed for four hours in a locked security office after a narcotics search 'would have believed that [s]he was not free to leave.' " *Id.* (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870). If we analogize to *RRA–A,* Bravo would not have been under arrest until the officers moved him from the security office to the holding cell, which occurred after the search of his toolbox yielded illegal drugs. *RRA–A* expressly held that the defendant was *not* under arrest when she was escorted to the security office, frisked, and made to wait for the results of the search.

Similarly, in *United States v. Doe,* 219 F.3d 1009 (9th Cir.2000), the defendant was taken to a security office, searched for weapons and contraband, and seated on a bench to wait a search of his vehicle. *Id.* at 1012. Once drugs were found, customs agents moved the defendant from the security office to a detention cell. *Id.* We held that the defendant was not in custody at the time he was escorted to the security office, but once drugs were found and he was moved to a detention cell "no reasonable person would have believed he was free to leave." *Id.* at 1014. Thus, the detention rose to an arrest when the de-

fendant was moved to a locked detention cell.[7]

▮ *RRA–A* and *Doe* allow us to isolate the impact handcuffing had on Bravo's reasonable belief whether he was free to leave. Because both *RRA–A* and *Doe* held that escorting an individual to a security office and searching them for weapons and contraband—which is what Inspector Tijerina did to Bravo—was *not* an arrest, the question for us is whether adding to the totality of the circumstances a handcuffed, 30–40 yard walk to the security office turns a detention into an arrest.

We hold that it does not. First, Inspector Tijerina told Bravo that the handcuffs were only temporary for both his safety and Bravo's and would be removed when they reached the security office, which was a short distance away. *See United States v. Yang,* 286 F.3d 940, 950 (7th Cir.2002) (finding that safety concerns made the brief use of handcuffs reasonable); *cf. United States v. Ricardo D.,* 912 F.2d 337, 340 (9th Cir.1990) (holding that officers "may move a suspect from the location of the initial stop without converting the stop to an arrest when it is necessary for safety or security reasons"). Second, Inspector Tijerina told Bravo that he would be free to leave if nothing was found in his truck. Third, Bravo was handcuffed for only one to two minutes during a 30–40 yard walk. *See Yang,* 286 F.3d at 950 (finding the brief time defendant endured in handcuffs negated conclusion that he was under arrest). Fourth, the handcuffs were re-moved in the security office as promised, and he was not made to await the search results in handcuffs. Finally, the handcuffs both protected Inspector Tijerina's safety and prevented Bravo's flight. Indeed, Bravo was only 20 yards from the border with nothing blocking him, customs officers had been shot before in similar circumstances, and evidence (*e.g.,* dog alert, space discrepancy, solid sound) created an individualized suspicion of illegal activity. Thus, Inspector Tijerina had particularized justification for his actions.

▮ Certainly an officer cannot negate a custodial situation simply by telling a suspect that he is not under arrest. *See United States v. Lee,* 699 F.2d 466, 467 (9th Cir.1982) (per curiam) (defendant was in custody even though agents informed him 9559 that he was "free to leave"); *cf. Butler,* 249 F.3d at 1099 (finding that the fact that an officer does not believe that he has probable cause to make an arrest does not control the "in custody" determination). However, Inspector Tijerina's statements that the handcuffs were only temporary are a factor in our totality of the circumstances analysis; his reassurances helped negate the handcuffs' aggravating influence and suggest mere detention, not arrest.

Taken together, the circumstances of Bravo's detention would lead a reasonable innocent person to believe that he would be free to go once the search was over and he answered any questions.[8] Therefore,

---

7. In *Butler,* customs agents escorted the defendant from his vehicle to a security office where an agent conducted a pat-down search, confiscated defendant's shoes and belt, and placed him in a locked holding cell. 249 F.3d at 1097. We held that custody began when the defendant was placed in the locked cell and had his shoes and belt taken. *Id.* at 1101. In contrast, Bravo was briefly handcuffed—not placed in a locked cell—and was told that the handcuffs were only temporary; addition-ally, his belt was not confiscated. It remains unclear what happened to Bravo's shoes, *see supra* note 6, but they apparently were not confiscated.

8. The dissent's assertion that we are ignoring an entire portion of our caselaw, *infra* at 1013–15, is puzzling. Relying on *Terry*-stop cases, the dissent argues that there are two approaches for determining whether a detention becomes an arrest. The first is whether a

the district court did not err in finding that Bravo was not under arrest, but rather was merely detained.[9]

## IV

■ Finally, Bravo argues that the statute under which he was indicted, 21 U.S.C. § 960, is facially unconstitutional because a trial judge, rather than a jury, determines the type and amount of drugs involved, which, in turn, impacts the length of the sentence imposed. In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that "any fact[other than the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *United States v. Mendoza–Paz*, 286 F.3d 1104, 1110 (9th Cir.2002), we squarely held that § 960 is

facially constitutional. Thus, we reject Bravo's argument as foreclosed by *Mendoza–Paz*.

■ Similarly, Bravo argues that *Apprendi* requires the government to prove that he knew both the type and quantity of drug he possessed and imported. Our recent decision in *United States v. Carranza*, 289 F.3d 634, 644 (9th Cir.2002), forecloses this argument as well.

## V

For the foregoing reasons, we conclude that the district court did not err in denying Bravo's motion to suppress evidence and motion to dismiss his indictment.

**AFFIRMED.**

PAEZ, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that there was reasonable suspicion to destroy the access

---

reasonable innocent person would feel free to leave after brief questioning, which is the analysis we apply. The second is whether the intrusiveness of the measures used was reasonable under the circumstances, which we did not explicitly ask, but is implicit in our analysis. In any event, the dissent's two-pronged approach, at least in our precedent, is actually fused into one analysis. In *United States v. Miles*, 247 F.3d 1009 (9th Cir.2001), we described the test for determining when a *Terry*-stop becomes an arrest: whether the detention exceeded "a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *Id.* at 1012 (quotation marks omitted). Then, "if the stop proceeds *beyond these limitations*," which, of course, the stop of Bravo did, "an arrest occurs ... if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *Id.* (quotation marks omitted) (citation omitted) (emphasis added). Contrary to the dissent's approach, our caselaw compels the analysis we have applied.

In any event, the *Terry*-stop framework is an inexact tool for use in the context of border stops and searches. To conduct a *Terry*-stop, an officer must have a particularized

suspicion of illegal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). By contrast, at the border officials can engage in routine searches and questioning without *any* suspicion whatsoever. *See Montoya de Hernandez*, 473 U.S. at 538, 105 S.Ct. 3304. This imperfect fit between the *Terry*-stop framework and border searches is probably why in *Butler, Doe*, and *RRA–A*—all of which involved the border—we did not apply the dissent's preferred analysis. Instead, we simply asked whether, under the totality of the circumstances, a reasonable innocent person would feel free to go after questioning, *Doe*, 219 F.3d at 1013; *RRA–A*, 229 F.3d at 743, or, more specifically, whether the person would believe that he was being subjected to "more than a temporary detention occasioned by border crossing formalities." *Butler*, 249 F.3d at 1100. Our *Terry*-stop jurisprudence is simply less helpful than the border search cases which we have applied here.

9. Because we hold that Bravo was not arrested, we do not reach the question of whether his later confession should have been suppressed under the "fruit of the poisonous tree" doctrine.

plate of the toolbox and to damage its surrounding area in order to search the hidden compartment. I disagree, however, with the majority's unnecessary discussion regarding whether the search was non-routine. The use of force, when coupled with significant damage to the property searched, can make a search non-routine. Nonetheless, because reasonable suspicion existed, I concur in the majority's holding in Part II that the district court did not err by denying Bravo's motion to suppress the evidence found in his truck. I also concur in Part IV.

I cannot agree, however, with the majority's approval of handcuffing a suspect who poses no danger to border customs agents or others, who presents no risk of flight, and who is not suspected of being involved in a violent crime. Under the circumstances here, I would hold that Bravo's detention became an arrest when he was handcuffed without justification. In my view, the majority gives the government *carte blanche* to engage in unnecessarily intrusive measures to detain individuals at the border without any justification whatsoever. Accordingly, I dissent from Part III of the opinion.

**A. Search of the Toolbox**

Because there was reasonable suspicion to justify the search of Bravo's toolbox, it is unnecessary to discuss whether the search was non-routine. Nonetheless, the majority reaches this issue and, in so doing, misreads *United States v. Molina–Tarazon,* 279 F.3d 709 (9th Cir.2002). It suggests that all three factors in *Molina–Tarazon*—the use of force, risk of danger, and psychological intrusion—must be present for a search to be non-routine. Those factors, however, just "happen[ed] to be the factors relevant in [that] case." *Id.* at 713 n. 5.

The use of force and its consequences may be sufficient in a particular case to make a search non-routine. We said in *Molina–Tarazon* that the use of force alone raises the inference of a non-routine search. *Id.* at 714. In light of this pronouncement, a search tends to be non-routine if the item searched is "significantly damaged" or "significantly altered," *see United States v. Okafor,* 285 F.3d 842, 846 n. 1 (9th Cir.2002), although, certainly, as the majority notes, "force alone is not dispositive of a search's routineness per se." Maj. op. at 1006–07 n. 1. That significant force tends to make a search non-routine is clear from our discussion in *Okafor,* in which we addressed whether making an incision into a nylon bag constituted a non-routine search. *See* 285 F.3d at 846. We focused exclusively on the use of force and the extensiveness of the resulting damage. *Id.* Although we did not decide whether the search was non-routine, because reasonable suspicion existed to make the incision and because the record did not reveal the size of the incision or whether the bag was permanently damaged, *id.,* we in no way suggested that we would need some other factor besides extensive force to find that the search was non-routine.

If force and resulting damage alone were insufficient to render a search non-routine, then customs inspectors at the border could completely destroy personal property without any justification. This cannot be the rule. Instead, force, when coupled with extensive damage or alteration, should be enough to make a search non-routine.

Here, although Bravo's toolbox was not completely destroyed, the extent of the damage to the toolbox strongly suggests that the search was non-routine. The inspectors destroyed the access plate and damaged the area around it, which was on the bottom third of one side of the toolbox.

We do not know whether the customs inspectors ever restored Bravo's toolbox to its original condition, although it is unlikely, based on Inspector Tijerina's testimony that the access plate could not be restored with adhesive. As the majority explains, we need not decide whether the search was non-routine because it was justified by reasonable suspicion.

## B. Whether Bravo Was Arrested When He Was Handcuffed

The majority errs by holding that Bravo's detention did not become an arrest and therefore did not require probable cause. Bravo's detention evolved into an arrest because the customs inspectors had no particularized justification for increasing the intrusiveness of the stop by handcuffing him.

We look to the principles set forth in *Terry*-stop cases to guide our determination of when a detention at the border becomes an arrest.[1] *See Montoya de Hernandez*, 473 U.S. at 542–44, 105 S.Ct. 3304. In determining under the totality of the circumstances whether a temporary detention has become an arrest, the *Terry*-stop cases generally involve two inquiries. The

majority discusses only the first of these, in which we examine whether a reasonable innocent person would feel free to leave after brief questioning. If a reasonable person would not feel free to leave under the circumstances, then the detention becomes an arrest. The majority ignores the second, despite our case law and that of every other circuit.[2] Under the second inquiry, we assess the intrusiveness of the measures used and whether such measures were reasonable under the circumstances. *E.g., United States v. Rousseau*, 257 F.3d 925, 929 (9th Cir.2001); *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir.1996). An intrusive detention that exceeds "a brief stop, interrogation and, under proper circumstances, a brief check for weapons" becomes an arrest if there is no justification for the restraint used. *Miles*, 247 F.3d at 1012 (quoting *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987)); *United States v. Ricardo D.*, 912 F.2d 337, 341–42 (9th Cir.1990) (holding that a juvenile suspect was arrested when several officers confronted him and then detained him in a patrol car, because the suspect had not attempted to flee and did not pose any danger to the officers). To

---

1. The majority asserts that "the Terry-stop framework is an inexact tool for use in the context of border stops and searches ... [because] officials can engage in routine searches and questioning without any suspicion whatsoever." Maj. op. at 1011–12 n. 8. Although the majority is correct that border customs agents have the right to ask routine questions without any suspicion, once an individual is detained we may use the Terry-stop cases to guide our analysis. See *United States v. Montoya de Hernandez*, 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) ("The final issue in this case is whether the detention of respondent was reasonably related in scope to the circumstances which justified it initially."); *id.* at 558, 105 S.Ct. 3304 (Brennan, J., dissenting) ("The Court supports its evasion of the warrant requirement ... by analogizing to the Terry line of cases autho-

rizing brief detentions based on reasonable suspicion.").

2. See *United States v. Navarrete–Barron*, 192 F.3d 786, 790 (8th Cir.1999); *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814–15 (6th Cir.1999); *United States v. Acosta–Colon*, 157 F.3d 9, 18–19 (1st Cir.1998); *Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3rd Cir.1995); *United States v. Blackman*, 66 F.3d 1572, 1576–77 (11th Cir. 1995); *United States v. Melendez–Garcia*, 28 F.3d 1046, 1051–52 (10th Cir.1994); *Oliveira v. Mayer*, 23 F.3d 642, 645–47 (2d Cir.1994); *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir.1993); *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir.1993); *United States v. Nurse*, 916 F.2d 20, 24–25 (D.C.Cir.1990); *United States v. Perate*, 719 F.2d 706, 709 (4th Cir.1983).

conclude otherwise would be inconsistent with the "narrow scope of the *Terry* exception" and would in effect circumvent the probable cause requirement. *See id.* at 340 (citing *Dunaway v. New York*, 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). If a temporary detention evolves into an arrest, seized evidence is excludable in criminal proceedings unless the arrest is justified by probable cause. *Washington*, 98 F.3d at 1186.

The First Circuit's decision in *United States v. Acosta–Colon*, 157 F.3d 9 (1st Cir.1998), illustrates how the detention/arrest inquiry has been applied to facts similar to those in this case, although the events at issue in that case did not take place at the border. In *Acosta–Colon*, dogs alerted to the possible presence of drugs in four suitcases checked on a domestic airline flight, and customs inspectors stopped several individuals, including Acosta–Colon, who they thought were associated with the bags before they boarded the flight. The inspectors informed the suspects that they were being taken to a " 'customs enclosure area' pending investigation of some suspicious baggage." *Id.* at 12. The inspectors did not ask any questions or conduct a pat-down search. The inspectors handcuffed the suspects and took them to the secure customs area, which took six to eight minutes. Once they reached their destination, the inspectors patted the suspects down, and, after finding no weapons, removed the handcuffs. The suspects were detained for approximately thirty minutes and missed their flight.

The First Circuit acknowledged that there is a reasonable person standard in determining when a detention becomes an

arrest, but explained that when a detention "has one or two arrest-like features but otherwise is arguably consistent with a *Terry* stop," it is difficult to assess how the detention would reasonably be perceived. *Id.* at 15. Under such circumstances, "the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop." *Id.*

Applying that test, the court held that the lack of particularized suspicion for the restraint used converted Acosta Colon's detention into an arrest. *See id.* at 21. The court explained that handcuffs—"one of the most recognizable indicia of a traditional arrest"—do not always convert a stop into an arrest. *Id.* at 18. Law enforcement cannot, however, routinely handcuff individuals. *Id.* at 18–19. Instead, law enforcement

> must be able to point to *some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.

*Id.* at 19. In the court's view, permitting handcuffing of Acosta–Colon would have sanctioned the use of handcuffs in every investigatory stop based on a suspicion of drug trafficking, a step the court was not prepared to take. *Id.*[3]

As in *Acosta–Colon*, handcuffing is the key factor to consider here. We have said that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Washington*, 98 F.3d

---

**3.** The court also found that taking Acosta–Colon to an interrogation room was problematic, because it was not justified by any safety concerns particular to Acosta–Colon.

*See id.* at 17. The fact that Acosta–Colon was not told how long he would be detained and not told that he was not under arrest was also of concern to the court. *See id.* at 15.

at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982)); *see also Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir.2002) (en banc) ("In cases involving investigatory or *Terry* stops, we have consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations."); *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir.2001) ("Under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop."). In light of the fact that handcuffing goes beyond the level of intrusion warranted for a *Terry* stop, and "is a substantial factor in determining whether an individual has been arrested," maj. op. at 1010, the majority should not have sanctioned its use here without determining whether it was reasonable under the circumstances of this case.[4] *See Washington*, 98 F.3d at 1188–90.

We tolerate a certain amount of restraint, including the use of handcuffs, during a detention, without finding that there has been an arrest, if there is some particularized justification. For example, we have held that intrusive measures are permissible during a detention if there is a risk of flight, a risk that the suspect may be dangerous to law enforcement or to others, or a violent crime has just occurred or may soon occur. *See, e.g., Washington*, 98 F.3d at 1189 & nn. 12–16; *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987).

None of these justifications, however, exists here. Bravo exhibited no sign of nervousness or any other indication that he might attempt to escape, nor did he present any danger. His waist area was frisked before he was handcuffed, and no weapons were found. *See Washington*, 98 F.3d at 1190 ("[T]here was no specific information indicating that either [suspect] was armed."). Nothing in the record indicates that Bravo was belligerent or uncooperative. *See id.* Instead, as Inspector Tijerina testified, Bravo was "very friendly, overly friendly, towards [him]." Nor was there any evidence that there had been a violent crime or that Bravo was about to commit such a crime. *See id.* Although Inspector Tijerina testified that he and Bravo were approximately 15 to 20 yards from Mexico and there was nothing to prevent someone from running back to Mexico, and that he was "aware of a situation where two other border patrol inspec-

---

4. Indeed, the majority minimizes the significance of handcuffing altogether, and understates the significance of handcuffing in *United States v. Juvenile (RRA–A)*, 229 F.3d 737 (9th Cir.2000). As the majority explains, we held that RRA–A was arrested when she was handcuffed, not when she was frisked and detained prior to the handcuffing, and not when she was subsequently informed that she was under arrest. The majority focuses on the fact that the handcuffing occurred after drugs were discovered. Maj. op. at 1010–11. As we explained in *United States v. Butler*, 249 F.3d 1094 (9th Cir.2001), however, it was not the discovery of drugs, but rather the handcuffing and the long detention, that prompted us to hold that RRA–A was arrested when she was handcuffed:

> It is true that the agents [in *RRA–A*] had found the drugs before the juvenile had

been handcuffed, but the key to the case is not that the drugs had been found, but that to a reasonable person, being handcuffed to a bench for hours in a locked office is more than a temporary detention occasioned by [routine] border-crossing formalities.... To a reasonable person, being handcuffed to a bench in a locked office means that he or she is in custody.

*Id.* at 1100; *see also id.* (explaining that the fact that drugs were discovered in *United States v. Doe*, 219 F.3d 1009 (9th Cir.2000), was not the "key fact" in determining that the defendant was thereafter in custody; rather, the "key fact ... was that the [defendant's] physical circumstances had changed from sitting on a bench in an office to being locked in a cell").

tors had been shot at th[at] very same port of entry by somebody that was being walked to secondary who was not handcuffed," these generalized concerns were insufficient to show any particularized concern about Bravo.

Nor would a suspicion that Bravo was involved in drug trafficking have justified handcuffing him. In *United States v. Del Vizo*, 918 F.2d 821 (9th Cir.1990), after suspecting that the defendant had been involved in a drug transaction, police officers ordered the defendant out of his van at gunpoint, forced him to lie down on the street, and then handcuffed him. *Id.* at 823. We held that the defendant was arrested at this point. *Id.* at 825. We explained:

> [T]he officers' suspicion that [the defendant] may have been involved in drug trafficking did not justify the extent of restraints imposed upon [him]. There was no evidence that [the defendant] failed to comply with police orders; on the contrary, undisputed testimony in the district court indicated that [the defendant] did exactly as ordered. There was no other evidence suggesting that [the defendant] was particularly dangerous, especially once he had stepped out of the van, had been frisked and was lying on the ground.

*Id.* (internal citation omitted); *see also United States v. Melendez–Garcia*, 28 F.3d 1046, 1052–53 (10th Cir.1994)("[T]he naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop.").

In sum, the generalized concerns articulated here were insufficient to justify the handcuffing. The majority's holding to the contrary justifies the routine handcuffing of *any* individual who is escorted from a primary inspection station to a security office at the border without any particularized justification whatsoever. Not only is this inconsistent with the limited purpose of a temporary detention at the border, but it also conflicts with our precedent, which requires some particularized reason for the use of restraint during a detention.

Because there was no particularized reason to justify the intrusive restraint measures used here, I would hold that Bravo's detention evolved into an arrest when he was handcuffed. The arrest was not justified by probable cause, because the officers had not discovered the drugs in Bravo's car when he was arrested. Thus, Bravo's subsequent confession should have been suppressed.[5]

\* \* \* \* \* \*

I cannot join the majority's view that *no* particularized basis is necessary for the use of intrusive measures of restraint at the border. We permit such restraint only if it is justified by a particularized concern that the suspect poses a threat of danger, is at risk of flight, or is suspected of having been or will be involved in a violent crime. A general concern that accompanies events at the border is not sufficient.

---

5. The discovery of the drugs did not constitute an intervening circumstance sufficient to remove the taint of the unlawful arrest. *See Taylor v. Alabama*, 457 U.S. 687, 692–93, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (holding that a fingerprint comparison that established probable cause did not "break the connection" between the prior illegal arrest and the subsequent confession, and thus the confes-

sion had to be suppressed); *cf. United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1300 (9th Cir.1988) (explaining that we have found "a subsequent release from custody, an appearance before a magistrate, discussions with a lawyer, and subsequent convictions on unrelated charges" to be intervening circumstances sufficient to remove the taint from an illegal arrest).