UNITED STATES of America,
Plaintiff–Appellee,

v.

Enrique NAVA, Defendant–Appellant.

No. 03–50364.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 2004.

Filed April 8, 2004.

Ellis M. Johnston, III, esq., San Diego, CA, for the defendant/appellant.

Carol C. Lam, United States Attorney, Patrick O'Toole, United States Attorney's Office, San Diego, CA, for the plaintiff/appellee.

Before: SILVERMAN, GOULD, and BEA, Circuit Judges.

SILVERMAN, Circuit Judge:

Today we once again hold that an individual is not arrested but merely detained when, at the border, he is asked to exit his vehicle, briefly handcuffed while escorted to the security office, uncuffed, patted down, and required to wait while his vehicle is searched.

## I. Facts

On December 1, 2002, at around 8:50 p.m., defendant Enrique Nava drove to the San Ysidro, California port of entry into the United States. Inspectors Santiago and Sloat were patrolling cars in "preprimary"—an area where cars are lined up to approach a primary inspection booth—when their narcotics detector dog alerted on the gas tank of Nava's pickup truck. Nava was asked to shut off his engine. He stated he had nothing to declare, and indicated that he was the owner of the vehicle. He was asked where he had been and where he was going, and he responded. Nava was asked for his identification and vehicle registration, and, as he took his identification out of his wallet, Santiago noticed Nava's hands were shaking. Santiago also noticed that after Nava had given over his license, "he was tossing his wallet side to side, you know, like, playing with it," which was "another sign of nervousness" to Santiago. Santiago further stated that he noted Nava's carotid artery was "pumping" and Nava's "body was tensing up."

Santiago then asked Nava to exit the vehicle, handcuffed him, and then escorted him to the security office. Santiago later testified that "I pretty much just said for safety reasons, sir, I am going to have to handcuff you and escort you to the security office." Santiago stated that "[i]t's always the statement I make . . . . It's more like a consideration for the traveling public, . . . not to scare them. Let them know you are not being arrested." He specifically said that he recalled making this statement to Nava.

The security office was located about 400 feet away from Nava's vehicle, and the walk there took around two or three minutes. At the office, Santiago removed the handcuffs, patted Nava down, and searched his shoes. Nava was also relieved of his wallet and keys.

Inspector Michelle McGinn was working secondary inspection that evening when Nava's pickup came in around 9:00 p.m. McGinn testified that she first looked under the truck "because [she] was informed that there was an alert to the gas tank. . . . [A]nd I noticed that there were scratch marks on the gas tank." This indicated to Inspector McGinn that there had been some tampering with the gas tank. McGinn then tapped the gas tank with her flashlight and "received a solid sound." She testified that this indicated there was something inside of the gas tank, as an ordinary gas tank that is filled just with gas will produce a "ringing sound." McGinn testified that she had performed such a tapping procedure over 100 times, and had been taught by other inspectors to perform this procedure. When there is some solid material in the gas tank,"[y]ou get a solid sound. It makes a thump." McGinn also said that tapping the gas tank is part of the "seven-point inspection" normally done at secondary.

At 9:30 p.m. McGinn called for a mechanic to remove the gas tank. The mechanic arrived around 10:00 p.m., and, when the vehicle was raised on the lift, McGinn noticed fresh tool marks on the bolts and a broken bolt, which indicated to her that the truck bed had been recently removed. The gas tank was removed, and, at around 11:00 p.m., 23.20 kilos of marijuana were found inside. At around 3:05 a.m., Nava was placed under arrest, was read his *Miranda* rights, and confessed that he knew there were drugs in the gas tank.

The district court denied Nava's motion to suppress his post-arrest confession and the drugs found in his truck. The court explicitly found that "it really wouldn't have mattered whether the dog alerted or not," as "there is no requirement for reasonable suspicion to contact a driver in a

preprimary position."[1] He stated, "You can go up to any vehicle at any time for any reason." The court ruled that the search became non-routine when McGinn requested that the contractor remove the gas tank; "[h]owever, I believe that there was actual probable cause for this non-routine search, based on the information that was known to Agent McGinn." As to Nava's arrest, the court ruled that Inspector Santiago's asking Nava to step out of his truck and handcuffing him and escorting him to the inspection area was a detention, not an arrest. The court reasoned that "it's reasonable that he would be asked to remain there until the search was completed.... Of course, once they found the marijuana, probable cause attached and he was arrested."

During the suppression hearing, Nava's attorney requested that additional discovery material relating to the drug sniffing dog be provided, but the district court stated in response that "[w]e may or may not even get to that, depending on the testimony." There is no other mention of this discovery request during the suppression motion hearing. The district court expressly did not rely on the dog in reaching the conclusion that the officers' conduct was reasonable under the circumstances.

## II. Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. The determination of probable cause to arrest a suspect is a mixed question of law and fact reviewed de novo. *United States v. Carranza*, 289 F.3d 634, 640 (9th Cir.2002), *cert. denied*, 537 U.S. 1037, 123 S.Ct. 572, 154 L.Ed.2d 458 (2002). Whether the government has conducted a legal border search is reviewed de novo. *United States v. Vargas–Castillo*, 329 F.3d 715, 722 (9th Cir.2003). Whether a border detention was based on reasonable suspicion is reviewed de novo as well. *United States v. Gonzalez–Rincon*, 36 F.3d 859, 863 (9th Cir.1994).

## III. Discussion

### A. The search of the truck was legal, and the drugs found in the gas tank are therefore admissible.

Nava argues on appeal that the search of the gas tank was non-routine and the government has not met its burden justifying it. As a result, Nava argues, the drugs found were the fruits of an illegal

---

1. While the district court expressly stated it was not relying on the dog search, and while no suspicion of any kind is needed to stop a car entering the United States and ask the kinds of questions Inspector Santiago posed to Nava, *see Molina–Tarazon*, 279 F.3d at 712 ("routine searches of persons and their effects entering the country may be conducted without any suspicion whatsoever"), we consider the dog alert as part of what aroused Inspector Santiago's suspicion and led to his initial encounter with Nava. Nava argues that the dog evidence may not properly be considered because he was provided only with "what amounts to a few lines on a certification of this dog at a date in the past," but not with "reports, evaluations, [and] standards." It is not clear from the record before us precisely what was disclosed by the government as part of its "dog discovery." However, we note that *United States v. Cedano–Arellano*, 332 F.3d 568, 571 (9th Cir.2003), requires only that the government turn over "the dog's training and certification records under Fed. R.Crim.P. 16," and nothing more. In *Cedano–Arellano*, "[t]he only evidence about the [narcotics] dog introduced at the hearing was the canine officer's testimony, without any supporting documentation." 332 F.3d at 570. The dog's handler "testified that the dog had been certified several times and had achieved a much-better-than-passing score on the certification tests." *Id.* at 571. Under these circumstances, we held that the defendant was not obliged to take the witness's word for it and thus that the dog's training and certification records were discoverable.

search and should be excluded. Although we had held that border officials must have "reasonable suspicion" to justify the removal of a vehicle's gas tank, *United States v. Molina–Tarazon,* 279 F.3d 709 (9th Cir.2002), the Supreme Court has now made clear that "the Government's authority to conduct *suspicionless* inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." *United States v. Flores–Montano,* 541 U.S. ——, ——, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004) (emphasis added). Thus, the search of Nava's truck, including the removal of the gas tank, was lawful. The district court properly denied the motion to suppress the drugs found in the tank.

**B. Nava's detention was legal and his post-arrest statements are therefore admissible.**

█ Nava's second argument on appeal is that when he was handcuffed and escorted to the secondary area he was "arrested," and not merely "detained," because a reasonable person would not have felt free to leave or that his detention was a mere "border crossing formality." He focuses on the facts that he was not told that if the officers found nothing he would be free to leave, that he was handcuffed and not told it would be temporary, and that his identification and keys were kept from him while he was waiting for hours at secondary. According to Nava, probable cause did not exist to justify this arrest; as a result, his post-arrest confession should be excluded as the fruit of an illegal arrest.

*United States v. Bravo,* 295 F.3d 1002, 1006 (9th Cir.2002), *cert. denied,* 538 U.S. 971, 123 S.Ct. 1775, 155 L.Ed.2d 530 (2003) is instructive and factually similar to this case concerning the question of the legality of Nava's detention. In *Bravo* we relied on our precedents to state that "escorting an individual to a security office and searching [him] for weapons and contra-

band—which is what [the officer] did to Bravo—was *not* an arrest...." *Id.* at 1011 (emphasis in original). We continued: "[T]he question for us is whether adding to the totality of the circumstances a handcuffed, 30–40 yard walk to the security office turns a detention into an arrest," concluding, "[w]e hold that it does not." *Id.* This conclusion was based in part on the facts that Bravo was told the handcuffs were only temporary and for safety reasons, was told that if nothing was found he would be free to leave, was handcuffed for only two to three minutes, had the handcuffs removed at the security office, and the handcuffs were to protect the officer and prevent flight. *Id.* In conclusion, the court noted that "the district court did not err in finding that Bravo was not under arrest, but rather merely detained." *Id.* at 1012.

This case is also similar to a companion case to *Bravo, United States v. Zaragoza,* 295 F.3d 1025 (9th Cir.2002). There, Zaragoza was entering the United States when a customs officer noticed his nervousness. *Id.* at 1026. An inspection of the vehicle revealed a non-factory compartment in the ceiling area of the camper shell, which sounded solid when tapped. *Id.* Zaragoza was asked to leave his truck, handcuffed, told that the handcuffs would be removed at the security office, told he was not under arrest and that he would be detained until his truck was searched, escorted to the security office, patted down, and left to wait while his vehicle was searched. A search of his vehicle uncovered illegal drugs. *Id.* at 1027. "Based on our decision in *Bravo,* the brevity of actual time Zaragoza spent in handcuffs, and the words of reassurance from [the customs inspector], we hold that Zaragoza was not under arrest or unreasonably detained for Fourth Amendment purposes." *Id.* at 1028.

Nava was asked to exit his vehicle, briefly handcuffed and told that the handcuffs were for safety reasons, told he was being escorted to a secondary waiting area, uncuffed, had a pat-down search conducted, and was asked to wait while his truck was searched. The only differences between Nava's detention and the detentions in *Bravo* and *Zaragoza* are that Nava was not explicitly told the handcuffing was temporary (but was told instead that the handcuffing was for safety reasons), he was not told he would be free to leave if nothing was found in his truck, and Nava was required to wait a longer period of time than the defendant in *Bravo*. However, these differences do not warrant a different result. The handcuffs remained on Nava for only a couple of minutes. If a person can be detained in a locked security office while his vehicle is searched, we can perceive no reason why he cannot be handcuffed for the two minutes it takes to get him there. The agents should not have to worry about the person becoming combative or trying to escape while being taken to the security office. *Cf. United States v. Hernandez*, 322 F.3d 592, 597 (9th Cir. 2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004) (holding that where defendant was removed from van, handcuffed, escorted to secondary, uncuffed, and had to wait while officials searched the van, the defendant was not arrested until after the drugs had been found and he had been recuffed and Mirandized; "We hold, under *Bravo*, that Hernandez was arrested by border agents in the security office after the agents positively identified the marijuana in the minivan, not while Hernandez was temporarily handcuffed by border agents while being escorted from his uncle's minivan to the security office.").

Nava cites numerous cases that stand for the notion that an effective seizure by the police amounts to an arrest requiring probable cause. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *United States v. Ricardo D.*, 912 F.2d 337 (9th Cir.1990). The factor missing from virtually all the cases cited, however, is that they do not take place at the border. As *Bravo* and other cases make clear, different rules apply at the border. *See Ramsey*, 431 U.S. at 619–21, 97 S.Ct. 1972 (referring to the "border-search exception" to the Fourth Amendment); *Bravo*, 295 F.3d at 1005–06; *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir.2001) ("It is well recognized that special rules apply at the border."); *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir.2000) ("the government has more latitude to detain persons in a border-crossing context"); *United States v. RRA-A*, 229 F.3d 737, 743 (9th Cir.2000) ("The government has more latitude to detain people in a border-crossing context . . . .").

In sum, we conclude that Nava's being asked to leave his truck, being handcuffed and told it was for safety reasons, being escorted in handcuffs to the security office, having had a pat down search conducted, and being forced to wait in the locked security office while his truck was searched did not constitute an arrest under the Fourth Amendment. Rather, it was a reasonable border detention. He was not arrested until the marijuana was found. His subsequent incriminating statements were therefore not the fruit of an unlawful arrest.[2] The district court did not err in denying the motion to suppress.

**AFFIRMED.**

---

**2.** We also agree with the government's alternative argument that the discovery of drugs in Nava's gas tank constituted intervening and

independent probable cause to arrest him, irrespective of the legality of his detention. As we have explained, the border officials had

the right to search the truck and remove the tank. The resulting discovery of the marijuana provided probable cause to arrest Nava. His subsequent interrogation was, therefore, not the fruit of an illegal arrest.