UNITED STATES of America, Plaintiff–Appellee,

v.

Ronald L. LINGENFELTER, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Gary MAROLF, aka Gary Marlow, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Lawrence MORGAN, Defendant–Appellant.

Nos. 92–50348, 92–50359 and 92–50362.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1993.

Decided June 30, 1993.

---

Donald M. Re, Los Angeles, CA, for defendant-appellant Lingenfelter.

Richard W. Bonner, Dana Point, CA, for defendant-appellant Marolf.

Michael D. Abzug, Los Angeles, CA, for defendant-appellant Morgan.

Jonathan S. Shapiro, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: WALLACE, Chief Judge, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

WALLACE, Chief Judge:

Lingenfelter, Marolf, and Morgan appeal from their judgments of conviction following conditional guilty pleas to conspiracy to import approximately 900 kilograms of marijuana in violation of 21 U.S.C. § 963. Lingenfelter and Morgan also challenge their conditional plea convictions for conducting a financial transaction involving the proceeds of drug trafficking in violation of 18 U.S.C. § 1956(a)(1). Lingenfelter alone appeals his sentence under the United States Sentencing Guidelines (Guidelines). The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm.

## I

On the morning of July 10, 1991, an anonymous telephone caller told Agent Stevens of the Drug Enforcement Administration (DEA) that Morgan was in possession of approximately two tons of marijuana, which was stored in a warehouse located at 1835 Whittier Avenue, unit C–6, in Costa Mesa, California (warehouse). The caller indicated that Morgan owned or operated a company entitled Royal Pacific Golf Association, which leased the warehouse. The caller gave Stevens directions to Morgan's residence and stated that Morgan drove a white Ford van which would be parked in the driveway.

DEA agents followed the directions provided by the caller to 929 Arbor Avenue in Costa Mesa and located the white van. California Department of Motor Vehicles records revealed that the van was registered to Morgan. At approximately 12:30 p.m., two men drove the van from Morgan's residence to the warehouse. After spending a few minutes inside the warehouse, the men reentered

the van and returned to Morgan's residence. Several minutes later, they returned to the warehouse and again spent a few minutes inside. They then left and drove to another residence in Costa Mesa, after which they returned to Morgan's residence.

During their surveillance, DEA agents observed that the warehouse was one of 30 to 35 units in a light industrial complex. Each unit had an office entrance in the front and a roll-up door in the back. A public alleyway ran along the rear of the units, where the roll-up doors were located. Unlike the other units in the complex, the warehouse was locked and the shades were drawn. The front bore the name Royal Pacific Golf Association.

At approximately 7:30 p.m., Officer Fleet of the Santa Ana Police Department and Carlos, his narcotics-sniffing canine, arrived at the warehouse. Fleet led Carlos along the public alleyway, as Carlos sniffed the roll-up doors of the unit next to the warehouse and then the warehouse. Carlos alerted to the warehouse.

Later that night, DEA Agent Potts obtained a search warrant for the warehouse, Morgan's residence, and the van. Potts attached to the affidavit in support of the search warrant a two-page unsigned expertise statement concerning Carlos's reliability that Potts had obtained from Fleet. Agents executed the warrant the next day and found approximately 1,445 pounds of Thai marijuana in the warehouse. The search of Morgan's residence and van uncovered additional evidence of narcotics trafficking.

On the day before the search of the warehouse, agents observed Morgan aboard a 55-foot motor sail ketch, the Asmara, which was in dry dock at the Blue Moon Marine boatyard in Newport Beach, California. The hull of the Asmara was covered by a blue plastic tarp which the agents thought might have been used to conceal work that was being performed on the vessel.

The next day, DEA Agent Donnelly spoke with several individuals at the boatyard in an effort to identify the owner of the Asmara. All of those questioned, including Lingenfelter, appeared nervous and gave evasive answers. The boatyard manager told the agents that Morgan had instructed him to remove the Asmara from the water. The manager also stated that the ship had been riding very low in the water when it arrived, and that Morgan had told him to repaint and change the water line. This information indicated to the agents that Morgan had attempted to hide the fact that the vessel had carried an extra-heavy cargo into port. Donnelly boarded the Asmara and found boat maps and charts indicating that the Asmara had recently returned from a trip to Thailand. Agents also observed that there was no registration number on the bow. Additional investigation revealed that the Asmara was not registered with the United States Coast Guard.

During the course of the search of the warehouse, Morgan told law enforcement agents that he was the owner of Morgan Rigging. Business records discovered in the search of Morgan's residence revealed that Morgan Rigging was a partner in Blue Moon Marine. In addition, the Asmara resembled an artist's rendition of a sailboat found in Morgan's briefcase. Finally, a drug "pay and owe" ledger sheet also found in the briefcase indicated the removal of cargo from a vessel.

The Asmara remained under continuous surveillance on July 11 and 12. On July 12, a shipyard employee told Agent Donnelly that he had been instructed to place the Asmara back into the water. Donnelly instructed the worker not to do so and seized the ship. A search of the vessel uncovered certain incriminating documents and two kilograms of Thai marijuana. Although Potts had prepared the application for a search warrant of the Asmara on Friday, the twelfth, she did not present the material to a magistrate until the following Monday because the vessel had already been seized.

Lingenfelter, Marolf, and Morgan moved to suppress the evidence obtained in the searches of the warehouse and the Asmara. In a declaration in support of his motion to suppress, Marolf stated that in 1990 he and Morgan had agreed to import marijuana from Thailand to California aboard the Asmara, which Marolf had purchased with

funds advanced to him by Morgan. Lingenfelter's declaration asserted that in 1990 and 1991 he had entered into an agreement with Morgan and Marolf to import marijuana from Thailand to California, and that, as part of the agreement, he had arranged to have the Asmara shipped from California to Hong Kong. Lingenfelter also stated that he was a shareholder in Blue Moon Marine, and that he had caused the Asmara to be pulled from the water and its cargo of marijuana unloaded for storage at the warehouse.

The district court concluded that neither Lingenfelter nor Marolf had standing to contest the search of the warehouse and that Lingenfelter did not have standing to challenge the seizure and subsequent search of the Asmara. The district court denied the motions to suppress.

## II

■ We first discuss the standing issues: whether Lingenfelter and Marolf had standing to challenge the legality of the warehouse search, and whether Lingenfelter had standing to contest the seizure and subsequent search of the Asmara. Where the facts are not in dispute, we review de novo the question of standing to assert a Fourth Amendment claim. *United States v. Echegoyen*, 799 F.2d 1271, 1277 (9th Cir.1986).

■ In order to challenge a search on Fourth Amendment grounds, a defendant bears the burden of demonstrating that he or she had a legitimate expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (*Rakas* ); *United States v. Singleton*, 987 F.2d 1444 (9th Cir.1993). Fourth Amendment rights are personal rights and "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134, 99 S.Ct. at 425. Under this rule, "coconspirators and codefendants have been accorded no special standing." *Alderman v. United States*, 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

■ Both Lingenfelter and Marolf ground their standing argument in the Ninth Circuit's "coconspirator exception" to the general *Rakas* rule that a defendant cannot contest the violation of another person's Fourth Amendment rights. *See United States v. Taketa*, 923 F.2d 665, 671 (9th Cir.1991). This exception provides that a defendant may challenge a search of a third party's property if he or she had a reasonable expectation of privacy in the place searched based on a formal arrangement indicating joint control or supervision. *See id.* Relying on this exception, Lingenfelter and Marolf contend that they were parties to a formalized agreement to import marijuana from Thailand to California aboard the Asmara and to store that marijuana at the warehouse.

In *United States v. Padilla*, —— U.S. ——, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993), *reversing*, 960 F.2d 854 (9th Cir.1992), however, the Supreme Court flatly rejected our coconspirator exception as inconsistent with *Alderman* and *Rakas*. As the Court stated, "[e]xpectations of privacy and property interests govern the analysis of Fourth Amendment search and seizure claims. Participants in a criminal conspiracy may have such expectations or interests, but the conspiracy itself neither adds nor detracts from them." *Id.,* —— U.S. at ——, 113 S.Ct. at 1939. Thus, Lingenfelter and Marolf must demonstrate that their *own* expectations of privacy or property interests were violated by the challenged police conduct.

■ Neither Lingenfelter nor Marolf has made a sufficient showing that his legitimate or reasonable expectations of privacy were violated by the search of the warehouse. Lingenfelter has also failed to make a sufficient showing with respect to the Asmara. The district court therefore did not err in denying their standing claims.

## III

■ Morgan contends that the district court erred in refusing to suppress evidence seized as a result of the warehouse search. The denial of a motion to suppress is reviewed de novo, although the underlying factual findings must be accepted unless they

are clearly erroneous. *United States v. Nance,* 962 F.2d 860, 862 (9th Cir.1992).

### A.

■ Morgan first argues that the canine sniff of the warehouse door was an illegal warrantless search, the results of which should not have been used to establish probable cause. Whether police conduct amounts to a "search" within the meaning of the Fourth Amendment is a mixed question of law and fact that is reviewed de novo. *United States v. Broadhurst,* 805 F.2d 849, 852 (9th Cir.1986).

The first clause of the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search within the meaning of this clause "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (*Jacobsen*).

The Supreme Court analyzed the Fourth Amendment implications of canine sniffs in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (*Place*). In that case, law enforcement officers detained Place's luggage at the airport in order to expose it to a trained narcotics detection dog. Although the Court found the 90–minute detention of Place's luggage unreasonable, *see id.* at 707–10, 103 S.Ct. at 2644–46, it determined that canine sniff was not "itself a search requiring probable cause." *Id.* at 706–07, 103 S.Ct. at 2644. The Court reasoned:

> A "canine sniff" by a well-trained narcotics detection dog ... does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff

tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

*Id.* at 707, 103 S.Ct. at 2644–45. Although the sniff-test discussion was not necessary to the decision in *Place,* the Court has characterized its analysis as a "holding." *Jacobsen,* 466 U.S. at 123–24, 104 S.Ct. at 1661–62. Thus, "[w]hether or not the statement in *Place* was a holding or dictum, the Supreme Court has clearly directed the lower courts to follow its pronouncement." *United States v. Beale,* 736 F.2d 1289, 1291 (9th Cir.) (en banc) (*Beale* ), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

In *Beale,* we applied *Place* and declared that subjecting luggage to a sniff test by a trained narcotics dog was not a search. *Id.* at 1291–92. We reasoned that such an investigative technique did not infringe any legitimate privacy interests because "(1) it discloses *only* the presence or absence of a contraband item, and (2) its use 'ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.' " *Id., quoting Place,* 462 U.S. at 707, 103 S.Ct. at 2644.

Morgan argues that while *Place* and *Beale* may justify the warrantless canine sniff of luggage, they should not be extended. We have already decided, however, that *Beale* is not limited to a search of luggage. *See Unit-*

ed States v. Dicesare, 765 F.2d 890, 897 (9th Cir.) (Dicesare) (holding that sniff test of automobile trunk not a search requiring probable cause), amended, 777 F.2d 543 (9th Cir.1985). Nevertheless, Morgan asks us to draw a line at the investigation of a commercial warehouse. He argues that he had a legitimate and reasonable expectation of privacy within the interior of the warehouse and that "the use of a trained dog to sense what [was] concealed inside" that warehouse violated his rights under the Fourth Amendment.

■ In essence, Morgan asks us to conclude that he had a reasonable expectation that the marijuana stored in his warehouse would remain hidden. Place and Beale hold otherwise. As the Court stressed in Place, a dog sniff is not a search in part because it "discloses only the presence or absence of narcotics, a contraband item." Place, 462 U.S. at 707, 103 S.Ct. at 2644. The Court elaborated on this analysis in Jacobsen, which held that a chemical field test that merely discloses whether or not a particular substance is cocaine was not a search. See 466 U.S. at 123–24, 104 S.Ct. at 1661–62. Because "Congress has decided ... to treat the interest in 'privately' possessing cocaine as illegitimate," the Court determined that "governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." Id. at 123, 104 S.Ct. at 1662. This conclusion, the Court stated, was dictated by Place. Id. As the Court explained, "the reason [the canine sniff] did not intrude upon any legitimate privacy interest was that the governmental conduct could reveal nothing about noncontraband items." Id. at 124 n. 24, 104 S.Ct. at 1662 n. 24. Whether the canine sniff is of luggage or the exterior of the warehouse, it "discloses only the presence or absence of a contraband item." Beale, 736 F.2d at 1291. Morgan, therefore, could have no legitimate expectation that a narcotics canine would not detect the odor of the marijuana stored in the warehouse.

Morgan asks us to reject Beale and adopt the Second Circuit's decision in United States v. Thomas, 757 F.2d 1359 (2d Cir.) (Thomas), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985), and cert. denied, 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986). In Thomas, a trained canine sniffed outside an apartment and alerted to the presence of narcotics inside the apartment. The Second Circuit rejected the notion that "a sniff can never be a search." Id. at 1366. Based on "the heightened privacy interest that an individual has in his dwelling place," id., the court reasoned that the defendant had "a legitimate expectation that the contents of his closed apartment would remain private, that they could not be 'sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." Id. at 1367. Morgan asserts that Thomas directly supports his argument that the use of a trained dog to sense what was inside his warehouse violated his legitimate expectations of privacy.

Thomas has been rightfully criticized. See United States v. Colyer, 878 F.2d 469, 475 (D.C.Cir.1989) (Colyer). As the District of Columbia Circuit has pointed out, Thomas implies that a person has a reasonable expectation that even contraband items hidden in his dwelling place will not be revealed. See id. This proposition, however, conflicts with the Supreme Court's determination that "[n]o legitimate expectation of privacy is impinged by governmental conduct that can 'reveal nothing about noncontraband items.'" Id., quoting Jacobsen, 466 U.S. at 124 n. 24, 104 S.Ct. at 1662 n. 24. As we made clear in Beale, Morgan did not have a legitimate expectation that the contraband stored in the warehouse would not be detected by a canine sniff. See 736 F.2d at 1291. Because Thomas rests on an incorrect statement of the law, we expressly reject its reasoning.

As in Beale, "we are not confronted with a case in which the detection dog conducted a sniff of a person rather than an inanimate object." Id. We thus need not decide whether this is still an area of concern after Jacobsen.

One further issue requires our attention. Morgan also contends that, even if law enforcement officials did not need probable cause and a warrant before they conducted

the sniff test, they at least should have been required to demonstrate a reasonable suspicion that contraband was in the warehouse. Although the Court in *Place* did apply a reasonable suspicion test, it was only to determine whether the temporary seizure of the luggage was permissible. *See* 462 U.S. at 700–06, 103 S.Ct. at 2640–44. The Court's conclusion that the canine sniff was not a search did not rely on this analysis. *See id.* at 706–07, 103 S.Ct. at 2644. Because no search was involved with the canine sniff, neither a warrant, nor probable cause, nor reasonable suspicion was required. *See Arizona v. Hicks,* 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987); *United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990); *Colyer,* 878 F.2d at 477.

**B.**

■ Morgan next argues that the search warrant for the warehouse was not supported by probable cause. A magistrate's determination of probable cause is reviewed under the "substantial basis" standard. *Dicesare,* 765 F.2d at 896.

■ A canine sniff alone can supply the probable cause necessary for issuing a search warrant if the application for the warrant establishes the dog's reliability. *United States v. Spetz,* 721 F.2d 1457, 1464 (9th Cir.1983). Pott's affidavit, together with the attached expertise statement from Officer Fleet, clearly established probable cause. The expertise statement stated that Carlos and Officer Fleet have participated in approximately 300 hours of training searches, and that Carlos has never given a false alert or failed to detect the drug and narcotic training aids that Carlos was asked to find. In all, Carlos has performed approximately 500 investigations and has been successfully relied upon in the past to sniff out narcotics. The anonymous tip, which was substantially corroborated by the police, also supported the magistrate's finding of probable cause. *Illinois v. Gates,* 462 U.S. 213, 241–46, 103 S.Ct. 2317, 2333–36, 76 L.Ed.2d 527 (1983). Morgan argues, however, that the magistrate improperly relied on the expertise statement because it was unsworn and not incorporated into the affidavit in support of the search warrant. The statement was stapled to the search warrant affidavit and submitted to the magistrate along with the form search warrant. The district court found that Potts "collectively swore" to all these documents and that "the attached expertise statement was thereby incorporated into the affidavit and validly formed part of the basis for the [magistrate] judge's probable cause determination."

■ Affidavits in support of search warrants "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), and therefore should "be tested and interpreted in a common sense and realistic, rather than a hypertechnical, manner." *United States v. Turner,* 770 F.2d 1508, 1510 (9th Cir.1985), *cert. denied,* 475 U.S. 1026, 106 S.Ct. 1224, 89 L.Ed.2d 334 (1986). Here, the expertise statement and search warrant affidavit were submitted to the magistrate as a packet at the time Potts was sworn. Construing the affidavit in a common sense and realistic manner, we agree with the district court that the expertise statement was incorporated into the search warrant affidavit. Thus, the statement was sworn by Potts and validly supported the magistrate's probable cause determination. *See United States v. Guerrero,* 756 F.2d 1342, 1348–49 (9th Cir.) (magistrate may consider hearsay statements in warrant application), *cert. denied,* 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984); *United States v. Berisford,* 750 F.2d 57, 58 (10th Cir.1984) ("There is nothing unusual about reading together the several components of an affidavit for search warrant, where properly incorporated or related by reference." (citations omitted)).

**C.**

■ Finally, Morgan asserts that the district court erred in not holding a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A denial of a request for a *Franks* hearing is reviewed de novo. *Dicesare,* 765 F.2d at 895.

A defendant is entitled to a *Franks* hearing only where he or she makes a substantial preliminary showing that "the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir.), *amended,* 769 F.2d 1410 (9th Cir.1985).

■ The defense subpoenaed Fleet and made an offer of proof that he would testify that Carlos would alert to the presence of contraband when, in fact, no contraband is actually present. The district court refused to allow Fleet to testify. Morgan contends that the offer of proof constitutes a substantial preliminary showing that the affiant omitted facts which, if the magistrate had known them, would have cast doubt on the existence of probable cause.

Despite the testimony predicted in its offer of proof, the defense admitted at the suppression hearing that it had not talked with Fleet and had based its offer on "other cases as well as case law." The offer thus was too speculative to constitute a sufficient preliminary showing to trigger a *Franks* hearing. The district court did not err in denying the defense's *Franks* motion.

## IV

■ Marolf contends that the district court erred in refusing to suppress evidence obtained as a result of the seizure and subsequent search of the Asmara. The legality of a search and seizure is reviewed de novo. *United States v. Linn,* 880 F.2d 209, 214 (9th Cir.1989) (*Linn*). The probable cause finding is reviewed de novo, although findings of fact are reviewed for clear error. *Id.*

■ A vessel is subject to forfeiture if law enforcement officials have probable cause to believe that it was used to transport controlled substances. 21 U.S.C. § 881(a)(4). In an analogous situation, "a vehicle may be seized even in the absence of probable cause to believe it contains contraband if there is nonetheless probable cause to believe that it was used to facilitate the transfer of contraband." *United States v. Johnson,* 572 F.2d 227, 234 (9th Cir.) (internal quotation omitted), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097,

57 L.Ed.2d 1137 (1978). Here, the agents observed Morgan on the Asmara. The water line of the vessel had been repainted, and the Asmara was not registered as required. When questioned about the Asmara, shipyard employees were nervous and evasive. Evidence seized in the search of the warehouse and Morgan's residence—business records, the drug "pay and owe" ledger sheet, and the artist's rendition of the Asmara—also linked Morgan and the drugs discovered in the warehouse to the Asmara. Law enforcement personnel clearly had probable cause to believe that the Asmara had been used to transport the marijuana seized in the search of the warehouse.

Marolf asserts that agents conducted a warrantless search when they lifted the tarp to inspect the Asmara and when they boarded the vessel in an effort to identify the owner of the ship, and that the information obtained in these searches cannot serve as a basis for probable cause. Even assuming that these searches were illegal, the other evidence obtained by law enforcement officials discussed above gave them sufficient independent probable cause to seize the Asmara without a warrant. *See United States v. Miller,* 812 F.2d 1206, 1208–09 (9th Cir. 1987).

■ Seizures for the purpose of forfeiture are subject to the warrant requirement. *Linn,* 880 F.2d at 215. Exigent circumstances, however, may excuse the failure to obtain a warrant. *Id.* The district court concluded that the Asmara had been "validly seized absent a warrant based on the existence of probable cause to believe that the vessel had been involved in the transportation of contraband, and exigent circumstances pursuant to the automobile exception, in light of Agent Donnelly's information that the vessel was to be put back into the water that afternoon."

■ We agree that exigent circumstances justified the warrantless seizure of the Asmara. On the day of the seizure, a boatyard employee informed Donnelly that he had been instructed to place the Asmara back into the water. The inherent mobility of the Asmara would have made it difficult to detain

once it was placed in the water. *See United States v. Maybusher*, 735 F.2d 366, 372–73 (9th Cir.1984) (applying automobile exception to seagoing vessels), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). The information provided to Donnelly therefore created the need to act quickly. *See Linn*, 880 F.2d at 215. As we concluded in *Linn*, "the 'mobility' underpinning of the automobile exception is, of course, closely related to our 'exigent circumstances' analysis, and is the compelling factor." *Id.*

■ Marolf also argues that the search of the Asmara after its seizure was "independently invalid." However, "[o]nce such property is lawfully in the government's possession, it may be searched at any time, and evidence found in the course of the search is admissible." *Id.* at 214–15.

### V

■ Lingenfelter contends that the district court erred in imposing a three-level enhancement in his sentence based on his role as "manager or supervisor" of criminal activity. The district court's construction and interpretation of the Guidelines are reviewed de novo. *United States v. Carvajal*, 905 F.2d 1292, 1294 (9th Cir.1990). The court's factual determinations are reviewed for clear error. *Id.* at 1295.

■ Section 3B1.1(b) of the Guidelines provides for a three-level increase in the base offense level where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). As part of his plea agreement, Lingenfelter stipulated that his offense level should be increased by three levels pursuant to section 3B1.1 because he acted as a manager or supervisor, and the criminal activity involved five or more participants. The district court properly determined that the three-level enhancement was appropriate. The record indicates that at least five people were involved in the importation scheme. In addition, Lingenfelter's own declaration in support of his suppression motion demonstrates that he performed a significant managerial role in the criminal enterprise.

**AFFIRMED.**