FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING DEFENDANT’S MOTION TO SUPPRESS
 

 PECHMAN, District Judge.
 

 This matter comes before the Court on defendant Guillermo Jesus Cruz-Roman’s motion to suppress evidence related to charges brought against him by the Government, which include 1) conspiracy to distribute the controlled substance cocaine, 2) possession of cocaine with the intent to distribute, and 3) possession of a firearm in furtherance of the conspiracy. The Court then held an evidentiary hearing on the suppression motion on February 3, 2004. Officers Dan Romero, Tyrone Hag-gin, and Randy Gallagher testified regarding the arrest of Mr. Cruz-Roman and the seizure of narcotics and paraphernalia from his residence. Also testifying on behalf of the Government was an analytical chemist, Mr. Luke Skifich. The defense called one expert witness regarding the odor of cocaine, Dr. Ramond Grimsbo. Having reviewed the papers and pleadings submitted by the parties, and having conducted an evidentiary hearing to establish the facts of the case, the Court hereby GRANTS the defendant’s motion. In support of that order, the Court does make and enter its findings of fact and conclusions of law as stated in detail below.
 

 FINDINGS OF FACT
 

 1. On Friday, October 24, 2003, officers Tyrone Haggin and Dan Romero, both members of an interagency narcotics task force, were conducting narcotics interdiction and surveillance activities at a SeaTac hotel. Those activities involved asking hotel personnel to identify patrons who paid in cash, and in particular those who extend their stay day-to-day using cash.
 

 2. On this particular morning at about 11:00 a.m., the officers were interested in the residents of Room 224, both because of payments in cash and because the occupants of the room drove a car with Texas plates. They observed an African American man using a cell phone exit the room and get into a blue Ford Escape.
 

 3. Officers Haggin and Romero followed the African American man some ten miles to an apartment complex in Kent, Washington. The officers observed the man talking with another African American man in the parking lot. The second man then went back into the apartment complex, and some minutes later returned with a small child. Both men and the child got into the blue Ford Escape. At about this time, the two officers called for a canine unit and were joined by another task force officer, Officer Randy Gallagher, the handler for the narcotics-sniffing canine “Bobbie.”
 

 4. The officers followed the two men to a Jack-in-the-Box restaurant, also in Kent, Washington. There they observed
 
 *MCD
 
 the second African American man get out of the blue Ford Escape and approach a black Ford Explorer SUV and enter the vehicle.
 

 5. The officers did not observe any package exchange. They observed no drugs. They observed no money change hands. They next saw the second African American man exit the Ford Explorer and return to the blue Ford Escape.
 

 6. The officers decided to end surveillance of the blue Ford Escape and its occupants, and instead follow the black Ford Explorer, which was driven by a Hispanic man later determined to be co-defendant Yael Bazan-Lopez.
 

 7. The officers followed Mr. Bazan-Lo-pez to a traffic signal where officer Haggin testified that he observed Mr. Bazan-Lo-pez, now in the left turn lane with the officers to his right, counting United States currency. The record does not establish whether Officer Haggin or Officer Romero was driving at the time.
 

 8. The officers ran the license plate of the black Ford Explorer through one database to obtain the name of the registered owner, Miguel Sanchez. They searched another data base to obtain the address of the registered owner listed on his drivers license. The address listed was for the Alderbrooke Apartments, Apartment C-104, in Lynnwood, Washington.
 

 9. The officers next followed Mr. Ba-zan-Lopez to a QFC grocery store in Lynnwood, Washington, where they observed him shopping for groceries.
 

 10. While Mr. Bazan-Lopez was in the grocery store, the officers performed an exterior narcotics sweep of the vehicle with Bobbie. Bobbie walked the perimeter of the vehicle, but did not alert, giving no indication of any narcotics around the vehicle.
 

 11. The officers continued to follow Mr. Bazan-Lopez once he departed from the grocery store, and he eventually led them to the Alderbrooke Apartments in Lynn-wood, Washington, at approximately 12:15 p.m. They observed him leaving the black Ford Explorer, but lost sight of him once he entered the apartment complex. They did, however, observe Mr. Bazan-Lopez entering the “E” building. At this point, the officers knew that he had entered one of six apartments, two on the lower level, and four on the upper level.
 

 12. The officers went to the lower set of two apartments, apartment numbers E-103 and E-104. The doors to these apartments are located side by side in a long breezeway closed in on three sides. Although the address listed for the registered owner of the Ford Explorer was apartment C-104, Officer Romero knocked on the door for E-104 and waited several seconds before deciding that no one would answer. While near the two doors, the officers testified that they smelled cocaine.
 

 13. Each of the officers described the smell differently — one officer said it was hard to describe, another that it was “like marijuana,” another described it as “chemical.” None of the officers had received any training in the identification of cocaine by smell, nor had they received training regarding the smells associated with the processing of cocaine.
 

 14 The Court finds that cocaine itself has no odor. What the officers may have been smelling was one of the solvents or cutting agents used in the processing of cocaine, such as acetone. Thus, some of the smells that were described were innocuous smells. For example, acetone has many legal commercial uses, such as paint thinner or fingernail polish remover, and therefore is not necessarily associated with cocaine.
 

 15. The officers then decided to walk Bobbie by the door to see if she would alert for the presence of narcotics. Bobbie
 
 *MCDI
 
 sat near the door to Apartment E-103, but did not sit in front of E-104. The sit in front of E-103 was interpreted by handler Gallagher to be an alert for the presence of one of the narcotics that Bobbie had been trained to detect.
 
 See
 
 specific findings related to the canine narcotics team below.
 

 16. The officers then discussed what to do next, including whether a warrant should be obtained. The officers decided to do what is called a “knock and talk.” Officer Romero knocked on the door to E-103 while the other two officers stood away from the door and out of sight of anyone who might be inside if the door were opened. At this point, no guns were drawn.
 

 17. A male voice from inside E-103 asked in Spanish who was there without opening the door. Officer Romero, who speaks Spanish, answered that it was “Dan.” He did not indicate at this time that he was a police officer. The voice responded that he did not know any “Dan.” Officer Romero then asked to speak to “Miguel,” the registered owner of the black Ford Explorer driven by Bazan-Lopez. The voice responded that there is no one there by that name.
 

 18. At this point, Officer Romero, as a “last effort” to get the occupant of E-103 to open the door, stated that he was with the police and that he wanted to talk with the occupant of the apartment. Officer Romero testified that he did not believe that the door would be opened without announcing his status as a police officer. The entire conversation to this point was conducted in Spanish and was not understood by officers Gallagher and Haggin, as they do not speak or understand Spanish.
 

 19. At that point, the door was opened. Officer Romero saw defendant Guillermo Jesus Cruz-Roman, who the officers had not seen up until this point, standing two to three feet inside the threshold of the apartment. Officer Romero also saw Mr. Bazan-Lopez, who he had seen before, standing behind and to the right of Mr. Cruz-Roman. He then noticed that Mr. Bazan-Lopez’ hand was at his side, out of the officer’s view. This apparently frightened the officer, so he announced “Show me your hands! Show me your hands.” Based on the fact that the other officers testified that they understood this command, and there being no testimony to the contrary, the Court finds that this command was given in English.
 

 20. Officer Romero saw Mr. Bazan-Lo-pez turn and duck to the right, into what was later revealed to be a bedroom. Officer Romero reached two to three feet into the apartment, grabbed Mr. Cruz-Roman by the shoulder and collar, pulled him out into the breezeway. Officers Romero and Gallagher dragged him down the breezeway some twenty-nine feet and placed him face down on the ground. Officer Gallagher used his handcuffs to restrain Mr. Cruz-Roman. During this altercation, the officers drew their weapons. The officers placed Mr. Cruz-Roman under arrest at this moment. At no time prior to this entry by officer Romero two to three feet into Mr. Cruz-Roman’s residence did the officers ask for or receive consent to enter the residence.
 

 21. The officers heard or saw others in the household who they believed were going to escape out the back door or windows. Officers Romero and Gallagher ran around the perimeter of the building. They found a juvenile and Mr. Bazan-Lopez exiting the apartment. Mr. Bazan-Lopez was not armed. Mr. Bazan-Lopez and the juvenile were arrested and taken back and placed in the breezeway, along with the defendant Mr. Cruz-Roman.
 

 22. At this point in time the officers had another discussion about their circumstances. They decided that they would go
 
 *MCDII
 
 into the apartment to determine if there were any other bodies. They had no information indicating that anyone else was in the apartment. Officers Haggin and Gallagher drew their weapons and did in fact go into the apartment for the stated purpose of doing a “protective sweep.” They took at least two minutes, during which time they shouted out “clear.”
 

 23. During the sweep of the apartment, the two officers saw, in plain view, cocaine powder residue, a large amount of cash, scales that they associated with the weighing of narcotics, and Saran-wrap and plastic bags that they associated with the packaging of narcotics. They exited the apartment and discussed their findings with Officer Romero, who was waiting in the breezeway where the defendant and the other two arrestees were being held.
 

 24. At that point the officers had another discussion, also close to where the defendant was being held, as to whether or not a warrant would be appropriate. Instead of obtaining a warrant, the officers decided to see if they could obtain consent of the occupants. The Court finds that a warrant could have easily been obtained as the time of this event was early in the afternoon on a Friday.
 

 25. The Court next finds that Mr. Cruz-Roman was separated from the other two suspects by Officer Romero. The officer read Mr. Cruz-Roman the
 
 Miranda
 
 warnings in Spanish. Mr. Cruz-Roman indicated that he has understood those warnings and his rights. No written waiver of those rights was obtained.
 

 26. Officer Romero told Mr. Cruz-Roman that this is his one chance to tell the officer what happened. Mr. Cruz-Roman responded that the drugs were not his, that he was the renter of the apartment, but that he was simply letting Mr. Bazan-Lopez stay with him.
 

 27. Officer Romero asked him for his consent to search the apartment. Officer Romero did not tell Mr. Cruz-Roman that he had the right not to consent. Mr. Cruz-Roman verbally indicated his consent to search the apartment.
 

 28. At the time he was asked for his consent, about 10 minutes had passed since the original knock at the door. The officers’ guns had been drawn during much of this time. Mr. Cruz-Roman had been handcuffed the entire time. Mr. Cruz-Roman had been able to witness two of the officers entering the apartment for a period of at least two minutes with guns drawn, and had been able to see the officers discussing what they had found inside the apartment when they returned.
 

 29. Mr. Cruz-Roman was asked to sign a written consent form. This took place either inside or outside the apartment— the officers’ testimony is in direct conflict on this particular point. The form was in English. Officer Romero testified that he verbally translated the form into Spanish for Mr. Cruz-Roman before he signed it. One of the other officers witnessed the signature, though he admitted that he could not understand the Spanish translation. The other officer thus relied on Officer Romero’s statement that he had translated the form before he signed it. Mr. Cruz-Roman then signed the consent form.
 

 30. The officers then searched Mr. Cruz-Roman’s home, finding substantial amounts of suspected cocaine in several places, including some in the freezer, some in a closet, and some in the cupboards. They also discovered large amounts of cash and a Springfield Armory .45 caliber semi-automatic pistol. Acetone and inosi-tol were also found in the kitchen, along with plastic bags and a dust or vapor mask. The suspected narcotic was later determined to in fact be cocaine hydrochloride.
 

 
 *MCDIII
 

 Findings specific to the Narcotics Canine
 

 31. With respect to “Bobbie,” the narcotics-sniffíng dog, and her handler Officer Gallagher, the Court finds that this team was not certified at the time of the investigation in front of apartment E-103. Although Officer Gallagher and Bobbie had completed training and had passed a certification test in September of 2003, the actual certification was not signed and completed prior to October 28, 2003. The investigation at E-103 took place on October 24, 2003.
 

 32. The Court also finds that “Bobbie” did not have a proven track record. Records of training exercises and actual narcotics investigations indicate that the team often made mistakes, and had no history-showing a strong percentage of correct search results in order to establish reliability.
 

 CONCLUSIONS OF LAW
 

 Based on the foregoing findings, the Court hereby holds that Mr. Cruz-Roman’s constitutional rights were violated when the officers involved conducted a warrantless search of his residence without probable cause or exigent circumstances, then entered his residence and arrested him without a warrant and without probable cause or exigent circumstances. In light of these holdings, the Court grants the motion to suppress each and every piece of evidence seized by the officers during this incident. Further, because all of the evidence is suppressed on these bases, the Court need not reach the issues of 1) whether the “protective sweep” of the apartment was independently improper, 2) whether statements made by Mr. Cruz-Roman after the arrest were made voluntarily, and 3) whether “consent” to search the premises was properly and voluntarily obtained from Mr. Cruz-Roman.
 

 1. The Court begins its analysis with the text of the United States Constitution. The Fourth Amendment provides:
 

 The right of the people to be secure in their persons,
 
 houses,
 
 papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 

 U.S. Const, amend IV (emphasis added). This language indicates that “[pjhysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.”
 
 United States v. United States District Court,
 
 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). This has led the Supreme Court to enunciate the “basic principle of Fourth Amendment law” that “searches and seizures inside a home without a warrant are presumptively unreasonable.”
 
 Payton v. New York,
 
 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980),
 
 citing Coolidge v. New Hampshire,
 
 403 U.S. 443, 474-475, 477-478, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (absent exigent circumstances, a warrantless search or seizure in a person’s premises is per se unreasonable). Thus, even where probable cause exists, “the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.”
 
 Payton,
 
 445 U.S. at 590, 100 S.Ct. 1371. Put another way, “a warrantless and nonconsen-sual entry into a suspect’s home to make a routine felony arrest is prohibited.”
 
 United States v. Driver,
 
 776 F.2d 807, 809 (9th Cir.1985),
 
 citing Payton,
 
 445 U.S. at 576, 100 S.Ct. 1371.
 

 2. Without any quantum of suspicion, however, an officer may conduct what is called a “knock and talk” at a residence,
 
 *MCDIV
 
 during which an officer knocks on a residence door, hoping that the occupant will voluntarily speak with him and/or open the door.
 
 United States v. Cormier,
 
 220 F.3d 1103, 1109 (9th Cir.2000) (police may do what any other citizen could do). Nevertheless, if an officer knocks and announces himself by saying “Police. Open the door,” opening the door is neither consensual nor voluntary.
 
 United States v. Winsor,
 
 846 F.2d 1569, 1573 n. 3 (9th Cir.1988) (en banc). “Compliance with a police ‘demand’ is not consent.”
 
 Id.
 
 Therefore, when police gain “visual entry into [a] room through [a] door that was opened at their command,” a “search” is conducted for Fourth Amendment purposes.
 
 Id.
 

 3. Even where exigent circumstances exist, the search of a residence or the arrest of a person within that residence
 
 must
 
 be supported by probable cause, not the lesser showing of “reasonable suspicion.”
 
 Winsor,
 
 846 F.2d at 1574. “The intrusiveness
 
 of
 
 the search is measured not by its scope, but by the expectation of privacy upon which the search invades.”
 
 Id.
 
 There is no place where the expectation of privacy is higher than in the residence.
 
 Id.
 

 4. In the present case, the Court first holds that Officer Romero unlawfully searched the interior of Mr. Cruz-Roman’s apartment when he convinced Mr. Cruzr-Roman to open the door to his residence and saw Mr. Bazan-Lopez within. The facts demonstrate that Officer Romero first attempted to get Mr. Cruz-Roman to open the door and speak with him without telling Mr. Cruz-Roman that he was a police officer. He said that his name was “Dan,” and that he wanted to speak with Miguel. The occupant responded by saying that he did not know any “Dan” and that there was no one present by the name of Miguel. When it appeared that the occupant was not going to speak further or open the door voluntarily, Officer Romero called on his authority as a police officer, telling the occupant that he was with the police and that he needed to speak with the occupant. Only then did Mr. Cruz-Roman open the door. This is what Officer Romero intended to have happen by invoking his authority, and this is exactly what happened. Given Mr. Cruz-Roman’s reticence to open the door absent this call to authority, the Court concludes that Mr. Cruz-Roman interpreted Officer Romero’s statements as a police demand to which compliance was not an option. Therefore, the Court holds that Officer Romero conducted a “search” for Fourth Amendment purposes when “gained visual entry into the room through the door that was opened” because he identified himself as an officer and demanded to speak with the voice behind the door.
 
 United States v. Winsor,
 
 846 F.2d 1569, 1573 (9th Cir.1988).
 

 5. Next, the Court holds that both this “visual entry” search and the resulting arrest of Mr. Cruz-Roman were unsupported by probable cause. The Government in fact conceded at oral argument that the officers did not have probable cause when the officers knocked on the door, and did not have probable cause to arrest Mr. Cruz-Roman when he was pulled from the apartment. The “probable cause” required to make an arrest is judged by the same standard as that for issuance of a warrant: police must have knowledge of “reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offence.”
 
 Beck v. Ohio,
 
 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). At the time that Officer Romero called upon his authority as an officer of the law to open the door, the officers knew three pieces of information: 1) that a suspicious transaction may have occurred in the parking lot of the Jack-in-the-Box restaurant, though they
 
 *MCDV
 
 witnessed no exchange and saw no narcotics, 2) that they detected an odor outside apartments E-103 and E-104; and 3) that “Bobbie” the narcotics-detecting canine had alerted outside apartment E-103, but not E-104.
 

 For independent reasons, the Court cannot give sufficient weight to these pieces of information to make a finding of probable cause, even when considered in the aggregate. First, with respect to the narcotics transaction, the officers never saw an exchange and never saw drugs. There were also numerous observations that the officers made that were inconsistent with such a transaction. Specifically, one of the supposed purchasers of the narcotics had a small child with him, and the narcotics canine did not alert on the suspect’s vehicle during a perimeter search. Second, the odor outside the apartments was not cocaine. The Government has cited no case law for the proposition that the odor of cocaine can be used to support probable cause. Indeed, the Court finds that powder cocaine does not have an odor. The officers may have detected a solvent, such as acetone, but such solvents have legitimate uses as well. It is also clear that the officers have never had any training on the odors of cocaine or associated solvents or cutting agents, and did not understand the distinction. This is not enough for probable cause.
 

 Finally, the Court holds that no finding of probable cause can issue from Bobbie’s alert. While it is true that a trained narcotics canine’s alert will ordinarily by sufficient on its own to establish probable cause, such a finding is only appropriate where the reliability of the dog has been established.
 
 United States v. Lingenfelter,
 
 997 F.2d 632, 639 (9th Cir.1993) (canine had 300 hours of training, had performed approximately 500 investigations, and had been successfully relied upon on numerous occasions);
 
 see also, United States v. Cedano-Arellano,
 
 332 F.3d 568, 573 (9th Cir.2003). Here, Bobbie’s reliability has not been established for two reasons. First, Officer Gallagher and Bobbie were not a certified team at the time of the investigation outside Mr. Cruz-Roman’s door. The Washington Administrative Code, Section 139-05-915, requires that a handler-canine team be certified prior to participating in investigations. The Gallagher-Bobbie team was officially certified a few days
 
 after
 
 the investigation in this case. As this is a Washington State regulation, and this prosecution is brought in federal court, this finding may not require disregard of the alert on its own. But the Court finds the lack of proper certification and compliance with the regulations to be strongly probative of the issue of reliability. Second, Bobbie simply was not an experienced narcotics-sniffing canine at the time of the investigation. There is no track record of reliability for this dog team. In light of these conclusions, the Court simply cannot credit Bobbie’s alert in order to establish probable cause. Therefore, the Court holds that the officers did not have probable cause when they gained visual entry into Mr. Cruz-Roman’s apartment.
 

 6. The Court next holds that Mr. Cruz-Roman was arrested from the moment he was pulled from his apartment, not simply “detained” for investigative purposes as envisioned in
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that a lesser showing of “reasonable suspicion” may justify a less intrusive stop and frisk). Whether a particular seizure of a person is an investigative detention or an arrest will depend on 1) the limits placed on the person’s freedom, and 2) the justification for those restrictions.
 
 United States v. Del Vizo,
 
 918 F.2d 821, 825 (9th Cir.1990).
 

 
 *MCDVI
 
 Here, Mr. Cruz-Roman was grabbed by the shoulder and collar from within his residence, detained and handcuffed at gunpoint, and remained completely restrained for well over ten minutes. Ordinarily, this degree of limitation on a person’s freedom will support a finding that the person has been arrested.
 
 See Washington v. Lambert,
 
 98 F.3d 1181 (9th Cir.1996). Mr. Cruz-Roman had done nothing at that point to make the officers think that he was dangerous, such as violent or non-cooperative behavior, and he had not been seen committing any suspected crime. Further, Officer Romero specifically testified that he had arrested Mr. Cruz-Roman at the time he pulled him from the apartment. While the subjective intent of the officer is not determinative of whether an arrest took place, the Court credits the officer with his assessment, which is supported by the objective facts.
 

 Even if the Government’s assertion that Mr. Cruz-Roman was merely detained for investigative purposes pursuant to
 
 Terry,
 
 the officers would not have had the requisite amount of suspicion required for such detention.
 
 [1]
 
 The Supreme Court has repeatedly held that reasonable suspicion must be based on specific, articulable facts individualized to the particular suspect detained.
 
 City of Indianapolis v. Edmond,
 
 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). At the time of the seizure of Mr. Cruz-Roman, the officers had
 
 no
 
 suspicion whatsoever individualized as to him. Mere association with others independently suspected of criminal activity will not give rise to probable cause, as contrary to the presumption of innocence.
 
 See Sibron v. New York,
 
 392 U.S. 40, 62-63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
 

 7. For identical reasons to those established in Conclusion of Law # 4, the Court holds that Mr. Cruz-Roman was arrested without probable cause to believe that he was involved in criminal activity.
 

 8. The Court next holds that the detention of Mr. Cruz-Roman can not be justified by the officers’ concern for Mr. Cruz-Roman’s safety. First, Officer Romero believed he was making an arrest. The Government’s counsel after-the-fact suggestion that this was protective act is directly contradicted by the facts that the defendant was thrown to the ground, handcuffed, and detained for a significant period of time, long after any immediate threat to his safety would have dissipated. Second, the Government’s reliance on
 
 United States v. King,
 
 990 F.2d 1552 (10th Cir.1993) is misplaced. In that case, the Tenth Circuit discussed the seizure of persons arising from an officer’s “community caretaking function.”
 
 Id.
 
 at 1560-61. But as the court made clear, the caretaking function justification for a seizure can only be relied upon in situations that are “totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.”
 
 Id., quoting Cady v. Dombrowski,
 
 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Such is not the case here. The only reason the officers were at Mr. Cruz-Roman’s apartment was their current investigation of what they suspected to be criminal narcotics activity.
 

 9. Next, the Court holds that the arrest of Mr. Cruz-Roman was in violation of his Fourth Amendment rights for an entirely more fundamental reason than that stated above. Regardless of the amount of suspicion that the officers may or may not have had, and regardless of whether the opening of the door was consensual or demanded, the arrest of Mr. Cruz-Roman
 
 *MCDVII
 
 simply can not be squared with the requirements of
 
 Payton.
 

 The Court reiterates that absent exigent circumstances, police may not enter a residence for the purpose of making a routine felony arrest without first obtaining a warrant from neutral and detached magistrate.
 
 Payton v. New York,
 
 445 U.S. 573, 576, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The facts of the present case are strikingly similar to those regarding one of the petitioners in
 
 Payton.
 
 In that case, victims of two armed robberies had identified petitioner Obie Riddick as the perpetrator.
 
 Id.
 
 at 578, 100 S.Ct. 1371. Thus armed with probable cause, but without a warrant, police officers knocked on Rid-dick’s house, which was opened by Rid-dick’s three-year-old son.
 
 Id.
 
 Upon seeing Riddick sitting in bed, the officers entered the house and arrested him.
 
 Id.
 
 They then conducted a “wingspan” search of a nearby dresser in accordance with
 
 Chimel v. California,
 
 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and found narcotics and related paraphernalia.
 
 Id.
 
 The Supreme Court held that the warrantless, nonconsensual entry and the resulting arrest and search, made with probable cause but within the confines of Mr. Riddick’s home, could not be supported under the Fourth Amendment, and the evidence seized was therefore suppressed.
 
 Id.
 
 at 590, 100 S.Ct. 1371.
 

 Similarly, the officers in the present case, having decided to proceed without a warrant, entered Mr. Cruz-Roman’s residence without consent, seized him by the shoulder and collar, removed him from his residence, and arrested him. The repeated testimony of the officers was that Mr. Cruz-Roman was standing some two to three feet inside his home. Thus, this is not equivalent to the facts in
 
 United States v. Santana,
 
 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), where the Court upheld the conviction of a person witnessed on the threshold of her residence, in public view, who was then arrested when she retreated into the residence. The Court in that case held that the arrest was valid, based on the rationale that the officers were then in “hot pursuit” of a person whose arrest was “set in motion in a public place.”
 
 Id.
 

 No such exigent circumstances existed in the present case. Indeed, none have been asserted by the Government.
 
 [2]
 
 Simply put, this was a routine felony arrest made within the arrestee’s residence, yet without a warrant and without exigent circumstances. The officers had ample time to obtain a warrant, discussed this on a number of occasions, and at each step decided to proceed without one.
 

 Nothing in
 
 Cormier
 
 or
 
 Winsor
 
 changes this analysis. While it is true that police may “knock and talk” with no requisite suspicion, this does not mean that the officers may then enter the residence and arrest the occupant once the door is voluntarily opened. In
 
 Cormier,
 
 the officer knocked and the door was immediately opened. 220 F.3d at 1107. She then asked the occupant if she could enter and talk with him; consent was given.
 
 Id.
 
 She then asked if she could search the room and the occupant’s luggage; consent was granted.
 
 Id.
 
 Only after her search revealed a weapon did she arrest the occupant.
 
 Id.
 
 As entry into the defendant’s
 
 *MCDVIII
 
 room was consensual, the
 
 Payton
 
 analysis did not apply.
 

 Similarly, in
 
 Winsor
 
 the police were in hot pursuit of a suspect seen leaving the scene of a bank robbery and entering a two-story hotel. 846 F.2d at 1571. They began knocking on every door in the hotel, announcing “Police. Open the door.”
 
 Id.
 
 Eventually, they found the room that contained the suspect, who opened the door to his room and was arrested; evidence of the bank robbery was also seized.
 
 Id.
 
 The Ninth Circuit held that while exigent circumstances existed that excused the officers from the need to obtain a warrant, exigent circumstances could not justify searches of residences not predicated on individualized probable cause.
 
 Id.
 
 at 1571. As it was stipulated that there was no probable cause to believe that the suspects were in a given room, the “visual entry” search of the room, gained when the door was opened upon demand by the police, was declared unlawful and the evidence seized was suppressed.
 
 Id.
 
 at 1579. Thus, this case only served to reiterate that a search of a residence, even under exigent circumstances, must be supported by probable cause.
 

 In total, the Court concludes that no exigent circumstances were present, and that the officers therefore needed a warrant to make their nonconsensual entry into the premises and arrest Mr. Cruz-Roman. Their failure to obtain a warrant made the search and arrest unlawful.
 

 10. Based on the Court’s findings, and on its holdings that Mr. Cruz-Roman’s Fourth Amendment rights were violated, the Court has no choice but to suppress all of the evidence, seized in the searches of Mr. Cruzr-Roman’s apartment made after the unconstitutional visual entry search and the unconstitutional arrest of Mr. Cruz-Roman.
 
 Mapp v. Ohio,
 
 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (declaring all evidence obtained by searches and seizures in violation of the Constitution inadmissible);
 
 see also, Brown v. Illinois,
 
 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)
 
 (Miranda
 
 warnings alone insufficient to remove taint of an unlawful arrest). The defendant’s post-warning statements and evidence seized in searches made after “consent to search” was given by Mr. Cruz-Roman must also be suppressed as tainted fruits of an unlawful search and arrest.
 
 Taylor v. Alabama,
 
 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982);
 
 Brown v. Illinois,
 
 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975);
 
 Wong Sun v. United States,
 
 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Court also finds, and the Government has not argued otherwise, that there was no significant passage of time or significant intervening circumstances that could possibly have removed the taint of the unlawful search and arrest.
 
 Brown,
 
 422 U.S. at 602, 95 S.Ct. 2254;
 
 United States v. Taken,
 
 648 F.2d 598, 601 (9th Cir.1981). All of the evidence against Mr. Cruz-Roman must be suppressed.
 

 CONCLUSION
 

 Having reviewed the papers and pleadings submitted by the parties, and based on the testimony exhibits presented at the evidentiary hearing, the Court hereby GRANTS the defendant’s motion to suppress in its entirety.
 

 The clerk is directed to send copies of this order to all counsel of record.
 

 [1]
 

 . In the first instance, the Court questions whether the rationale in
 
 Terry
 
 can ever apply to justify a seizure after a warrantless, non-consensual entry into a person's home.
 
 See Payton v. New York,
 
 445 U.S. 573, 576, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).
 

 [2]
 

 . To the extent that the Government obliquely argues that circumstances warranted immediate action, those circumstances were created by the officers themselves. The case law is clear that officers cannot make a warrantless entry into a residence based on exigent circumstances that they themselves created.
 
 United States v. Driver,
 
 776 F.2d 807, 810 (9th Cir.1985) ("The agents in this case would not have had to fear for their safety if they had not first entered the warehouse.”).